**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mason TOWNSEND, Luis E. Diaz, Orlando Nunez, Dorothy Taylor, Carlos Mejia, Joseph Angel Claudio, and Isabel Marquez, Defendants–Appellants.**

Nos. 88–3271, 88–3315, 88–3339, 88–3371, 88–3398, 88–3418 and 89–1037.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1990.

Decided Feb. 14, 1991.

Thomas M. Durkin, Asst. U.S. Atty. and Lisa K. Osofsky, Office of the U.S. Atty., Chicago, Ill., for plaintiff-appellee.

William H. Theis, Nathan Diamond–Falk, Michael E. Deutsch, Peoples Law Office, Daniel L. Franks, George C. Howard, Gary Senner, Sonnenschein, Nath & Rosenthal, Richard R. Mottweiler, Mark W. Solock, Elliott T. Price and Jerry B. Kurz, Hall & Kurz, all of Chicago, Ill., for defendants-appellants.

Before CUDAHY, POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

More than 40 years ago, Justice Jackson observed that the development of the law of conspiracy—"that elastic, sprawling and pervasive offense"—illustrates perfectly the truth of Justice Cardozo's maxim about

"the tendency of a principle to expand itself to the limit of its logic." *See Krulewitch v. United States,* 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949) (Jackson, J., concurring). This case tests the limit of the logic underlying conspiracy law.

## I. The Conspiracy Conviction

The government charged that the defendants conspired together and with others to possess and distribute heroin, cocaine, and marijuana between December 1986 and February 1988. The evidence against each of the defendants was gathered during the course of an undercover investigation that focused on the drug trafficking activities of Apolinar Marquez, a dealer who was indicted along with the defendants and subsequently pleaded guilty. The government set up drug buys from Marquez and tapped his home phone, along with the business phone of codefendant Luis Diaz; anyone who discussed drugs on these two phone lines was indicted as a member of the conspiracy. The indictment charged nineteen defendants as members of the conspiracy; seven are parties to this appeal. Defendants Luis Diaz, Carlos Mejia, Joseph Angel Claudio, and Orlando Nunez, the government asserted, supplied narcotics to Marquez; Dorothy Taylor and Mason Townsend purchased drugs from Marquez for distribution to their own customers. Isabel Marquez, Apolinar's wife, assisted him in his dealings with these and other codefendants who are not parties to this appeal. On appeal, the defendants argue jointly that the government's proof failed to establish the existence of a single, ongoing conspiracy, as charged in its indictment.

### A. *Single v. Multiple Conspiracies*

As will be seen, the evidence clearly demonstrated that all but one of the defendants conspired with *someone* to distribute drugs. Why, then, do we care whether there was one conspiracy or many; what does it matter whether the defendants conspired as one large group or several smaller groups? There are at least three reasons. First, alleging a single conspiracy enables the government to join a group of defendants together for trial, and joint trials almost always prejudice the rights of individual defendants to some degree. Some trade-off between prejudice and efficiency is, of course, necessary for the judicial system to function; otherwise "the slow pace of our court system would go from a crawl to paralysis." *United States v. Walters,* 913 F.2d 388, 393 (7th Cir.1990). Nevertheless, defendants are tried together only in cases where the prejudice to the defendant does not deprive him of a fundamentally fair trial and where a joint trial contributes significantly to the efficiency of the judicial system. *See* Fed.R.Crim.P. 2 (Rules of criminal procedure "shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.").

Second, and particularly apposite to this case, by alleging a single conspiracy, the government may invoke the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), to admit evidence against defendants that would otherwise be inadmissible. Statements of any of the defendants can be used to establish not only the existence of a conspiracy but also to establish that a particular defendant was a member of the conspiracy. *United States v. Martinez de Ortiz,* 907 F.2d 629 (7th Cir.1990) (en banc). In briefs filed before our decision in *Martinez de Ortiz,* the appellants jointly contested the government's use of coconspirator statements to prove each defendant's membership in a conspiracy. That argument is moot now, but the appellants' challenge underscores the potency of the coconspirator exception and the need to ensure that it is invoked only against those who have actually conspired with the declarant.

And third, coconspirators are liable for the substantive crimes committed by members of the conspiracy that are in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). A finding that a defendant joined a conspiracy therefore exposes that defendant to much more than criminal liability for joining the con-

spiracy; he or she also faces liability for the substantive crimes of the conspiracy. A related consideration arises in drug cases. The type of drug with which one is involved does not change the nature of crime; 21 U.S.C. § 841(a) applies to all illicit drugs. Nevertheless, the penalties incurred vary dramatically with the type of drug involved in the offense. *See* 21 U.S.C. § 841(b). One convicted, as were the appellants in this case, of a conspiracy to distribute a variety of drugs can be sentenced to the highest range applicable to the drugs in which the conspiracy dealt even if the evidence suggests that a defendant had nothing to do with that drug. *See* 21 U.S.C. § 846.

The creation of the Sentencing Guidelines did nothing to limit a conspirator's derivative exposure, because under the Guidelines conspirators must be sentenced on the basis of the total quantity of drugs the conspiracy can reasonably be estimated to have dealt in. *See* U.S.S.G. § 1B1.3 and comment. (n.1e); *United States v. Franklin,* 902 F.2d 501, 504 (7th Cir.1990); *United States v. White,* 888 F.2d 490, 496–97 (7th Cir.1989). Moreover, the Guidelines provide equivalency tables that effectively increase the sentence awarded for trafficking in more dangerous drugs. *See* § 2D1.1.

■ The defendants style their claim as one of a fatal "variance" between the government's indictment and its proof.[1] We have in the past noted that a conspiracy variance claim amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy. Whether a single conspiracy exists is a question of fact; consequently "[t]he jury gets first crack at deciding 'whether there is one conspiracy or several when the possibility of a variance appears.'" *United States v. Paiz,* 905 F.2d 1014, 1019 (7th Cir.1990) (quoting *United States v. Percival,* 756 F.2d 600, 609 (7th Cir.1985)). This is because the jury's verdict must be interpreted

as a finding that the government presented sufficient evidence to prove its indictment beyond reasonable doubt, and that is all that we require of the prosecution. The fact that the government's evidence might also be consistent with an alternate theory is irrelevant; the law does not require the government to *disprove* every conceivable hypothesis of innocence in order to sustain a conviction on an indictment proved beyond reasonable doubt. *United States v. Beverly,* 913 F.2d 337, 361 (7th Cir.1990); *United States v. Douglas,* 874 F.2d 1145, 1152 (7th Cir.1989). Consequently, "even if the evidence arguably establishe[d] multiple conspiracies, there [is] no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *United States v. Prince,* 883 F.2d 953, 959 (11th Cir.1989).

■ A "sufficiency of the evidence" approach to solving the multiple conspiracy puzzle can be misleading, however, because it suggests that if the evidence is insufficient to support the jury's finding that a defendant conspired with every defendant charged in the indictment his conviction must fall. That conclusion is incorrect. The crime of conspiracy focuses on agreements, not groups. True, it takes at least two to conspire, but the government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group. "[I]t is the grand jury's statement of the 'existence of the conspiracy agreement rather than the identity of those who agree' which places the defendant on notice of the charge he must be prepared to meet." *United States v. Piccolo,* 723 F.2d 1234, 1239 (6th Cir.1983) (quoting *United States v. Davis,* 679 F.2d 845, 851 (11th Cir.1982)). Thus the government is permitted to allege in an indictment, as it did in this case, that, in addition to the defendants named in a conspiracy count, the defendants conspired "with oth-

---

1. A variance arises when the facts proved by the government at trial differ from those alleged in the indictment. *See generally United States v.*

*Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985).

ers known and unknown to the grand jury." *See Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951); *see also United States v. Lippner,* 676 F.2d 456, 465 (11th Cir.1982) (no fatal variance when indictment charged conspiracy among named defendants and "one other person known to grand jury" and no evidence presented at trial of any additional person's involvement). So to overturn a conspiracy conviction on the ground of variance, an appellant must show both that he did not conspire with each defendant *and* that he was prejudiced by being tried with defendants who were not his coconspirators. *See* Fed.R.Crim.P. 52(a) ("Any ... variance which does not affect substantial rights shall be disregarded."); *see also Kotteakos v. United States,* 328 U.S. 750, 752, 66 S.Ct. 1239, 1241, 90 L.Ed. 1557 (1946) ("The only question is whether petitioners have suffered substantial prejudice from being convicted of a single general conspiracy by evidence which the Government admits proved not one conspiracy but some eight or more...."); *United States v. Varelli,* 407 F.2d 735, 744 (7th Cir.1969) ("Having found that two conspiracies were proved instead of the one charged, this Court must decide whether the rights of defendants have been prejudiced by all the defendants being tried together.").

■ To join a conspiracy, then, is to join an agreement, rather than a group. It follows that to be a conspirator you must know of the agreement, *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985), and must intend to join it, *United States v. Bruun,* 809 F.2d 397, 410 (7th Cir.1987). *See also United States v. Auerbach,* 913 F.2d 407, 414–15 (7th Cir.1990) (citing cases). Defendants, while conceding that the evidence may have shown that several agreements to distribute drugs existed among various subgroups, contend that the government presented no evidence that any of those dealing with Apolinar Marquez knew of, or intended to join, a larger agreement between Marquez and others to distribute drugs.

■ In evaluating these claims, we need not limit our search to *direct* evidence. Conspiracies, like other crimes, may be proved entirely by circumstantial evidence. *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990). If the prosecution presents enough circumstantial evidence to support, beyond reasonable doubt, an *inference* that the defendants agreed among themselves to distribute drugs, a jury would be justified in convicting those defendants of conspiring together. The critical question, then, is whether the jury may reasonably *infer* a single agreement among the defendants from the evidence of the drug transactions presented by the government.

Typically we say that if the evidence indicates that a defendant must have known that his actions were benefitting a larger conspiracy, he may be said to have agreed to join that conspiracy.[2] Seizing upon this logic, the government submits that by dealing with Apolinar Marquez, who was known by each defendant to be a large-scale drug dealer, each defendant supported, and therefore conspired with, the others with whom Marquez dealt. Taken to its extreme, the government's logic suggests that anyone selling or buying drugs from any one of these defendants also could have been convicted as a coconspirator. Anyone who does so must know, so its reasoning goes, that he's dealing with someone connected to a large drug conspiracy; each benefits from dealing

---

**2.** "The cases sometimes say must know, less frequently must have reason to know. Taken literally the latter formulation would imply something very curious indeed, that a conviction can be upheld without proof beyond a reasonable doubt of an element of the crime (knowledge of the conspiracy)." *Cerro,* 775 F.2d at 911. *See generally* Robbins, *The Ostrich Instruction: Deliberate Ignorance as a Criminal*

*Mens Rea,* 81 J.Crim.L. & Criminology 191 (1990)). But as we went on to point out in *Cerro,* "it should not be taken literally. Although usually in the law to say that someone has 'reason to know' something means that he would be negligent in not knowing it, in the present context it means only that knowledge can be inferred from circumstantial evidence." 775 F.2d at 911.

with the conspiracy; therefore each participant is a member of the conspiracy.[3]

We think the government's argument stretches the boundaries of conspiracy law to the breaking point. We recognize that, by their very nature, drug conspiracies are loosely-knit ensembles. Where drug distribution conspiracies are charged, we can often infer that "the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another." *United States v. Bruno,* 105 F.2d 921 (2d Cir.), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). But the liability of members of the distribution chain is predicated upon the notion that participants at different levels in the chain know that the success of those at each level hinges upon the success of the others and therefore cooperate for their mutual benefit. Only if "the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers," *id.,* will the inference of knowledge and benefit be valid.

One may question, however, whether "the links of a narcotics conspiracy are inextricably related to one another, from grower, through exporter and importer, to wholesaler, middleman, and retailer, each depending for his own success on the performance of all the others." *United States v. Borelli,* 336 F.2d 376, 383 (2d Cir.) (Friendly, J.), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1964). The suppliers in a "chain" are not necessarily interested in the success of a particular retailer, or group of retailers, down the line. If the chain is characterized by sporadic dealings between independent dealers, what do suppliers care if the middlemen are able to unload the stuff further? As Judge Friendly noted in *Borelli,*

however reasonable the so-called presumption of continuity may be as to all the participants of a conspiracy which intends a single act, such as the robbing of a bank, or even as to the core of a conspiracy to import or resell narcotics, its force is diminished as to the outer links—buyers indifferent to their sources of supply and turning from one source to another, and suppliers equally indifferent to the identity of their customers.

336 F.2d at 384. We reiterated this point in *Cerro,* where we observed that "the viability of wholesale drug trafficking does not depend on the adherence of any single dealer. Lop off one dealer, and the wholesaler can hire another in his place...." 775 F.2d at 914.

The chain paradigm is also flawed because it does little to establish any relationship between parties tied horizontally rather than vertically—*i.e.* those working at the same level of distribution—when they are charged with conspiring together. To evaluate these relationships we often invoke another conspiratorial paradigm—the wheel—comprised of a group of conspirators playing similar roles—the "spokes"—each related to the activities of a single "hub" conspirator or group. Again, however, mere knowledge of the hub's activities, or those of the other spokes, is not enough to tie the conspiracy together. In *Blumenthal v. United States,* 332 U.S. 539, 558–59, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947), for example, the Court distinguished the multiple conspiracies of *Kotteakos* from the single "wheel" conspiracy it was addressing:

Except for ... the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts

---

**3.** *See Appellee's Brief* at 20: "Here, each defendant knew or had reason to know that others were involved in an overall narcotics distribution scheme, and had reason to believe that his benefit from membership in the scheme depended on the success of the scheme as a whole; thus, each participated." As written, this argument begs the question of whether each defendant agreed to join the conspiracy; it posits that the reason each defendant participated in the conspiracy was to ensure that he benefitted from participating in the conspiracy. In context, however, we think our characterization of the government's argument is accurate.

of a larger general scheme.... Here the contrary is true.

Neither of these paradigms suffices, then, to show mutual support or interest among the component parts of the organizational construct. They don't eliminate the need to inquire directly into whether the defendants had a mutual interest in achieving the goal of the conspiracy and their relevance is therefore questionable. The fact that we can squeeze a group into a hypothetical organizational chart says little about whether a single agreement exists between the members of the group. As we observed in *United States v. Pallais*, 921 F.2d 684, 686 (7th Cir.1990), an enterprise "can have many divisions, programs, activities, contracts; they are not all a single agreement just because a handful of top officers is in charge of the entire firm and some of the lower-level employees may work on more than one program or contract."

It is easy to say, as we have in the past, that to be liable as coconspirators, defendants must be mutually dependent on one another, *United States v. Percival*, 756 F.2d 600, 607 (7th Cir.1985), or must render mutual support, *Cerro*, 775 F.2d at 914. But "it is a great deal harder to tell just what agreement can reasonably be inferred from the purchase, even the repeated purchase, of contraband...." *Borelli*, 336 F.2d at 384. By definition, market transactions—whether in legal or illegal markets—benefit both parties, but we do not assume, *ab initio*, that they carry with them the excess baggage of conspiracy. The agreement between the parties may not transcend the scope of the transaction itself. For example, in the absence of other evidence we would not *presume* that one who purchases drugs from a dealer who also runs an automobile "chop shop" intends to join the car theft ring, even if he knows about it. Neither activity necessarily, or even logically, advances the other. The analysis doesn't change when the other party confines his criminal activities to one market. For example, if a thief plans to rob two banks, with a different accomplice on each occasion, we do not presume, from this fact alone, that the three bank robbers have conspired together, even if each accomplice knows that his partner is also planning a robbery with someone else. *See* Note, *Developments in the Law—Conspiracy*, 72 HARV.L.REV. 920, 933 (1959).

■ By the same token, when dealer A sells drugs to dealer B, we don't presume that A has agreed to work for the benefit of everyone else with whom B deals, or that A benefits from B's other deals. If A knows of, and benefits from, B's subsequent distribution, we may infer a limited agreement to distribute between A and B. *See, e.g., United States v. Roth*, 777 F.2d 1200, 1205 (7th Cir.1985) ("while the ultimate consumer is not himself a conspirator ... the middleman is"). But agreement to join *other* endeavors and distributors "cannot be drawn merely from knowledge the buyer will use the goods illegally." *Direct Sales Co. v. United States*, 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674 (1943) (interpreting *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940)). The scope of a conspiracy is determined by the scope of the agreement, *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir.1989), and if the jury is to infer an agreement to join a conspiracy that transcends the scope of a more limited conspiracy, there must be some additional evidence to justify taking the inference further:

> A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time, and the circumstances may also warrant the inference that a supplier or a purchaser indicated a willingness to repeat. But a sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties *for whatever period they continue to deal in this type of contraband, unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction.*

*Borelli*, 336 F.2d at 384 (emphasis added).

To sustain a conspiracy conviction, then, there must be "more than suspicion, more

than knowledge, acquiescence, carelessness, indifference, [or] lack of concern." *Direct Sales,* 319 U.S. at 713, 63 S.Ct. at 1270. Drug dealers are no more likely to be confederates than are criminals who engage in disparate activities; this is true even if A knows that B deals with others as well. In *United States v. Dennis,* 917 F.2d 1031 (7th Cir.1990), for example, we reversed the conspiracy conviction of a defendant that was supported only by evidence that he had sold drugs to the same source as another defendant. In *United States v. North,* 900 F.2d 131 (8th Cir.1990), the court vacated the sentence of a defendant convicted of conspiring to distribute drugs that was based, in part, on a quantity of drugs found in the possession of his coconspirator. Remanding the case for resentencing, the court observed that "North [the defendant] admits that he knew that Murphy sold drugs to other persons.... Murphy's other sales were merely another part of Murphy's distribution practice and we cannot say that every act of distribution taken by Murphy, once North became involved with Murphy, was in the furtherance of their conspiracy." *Id.* at 134 (emphasis supplied); *cf. United States v. Fiorito,* 499 F.2d 106, 109 (7th Cir.1974) (evidence of conspiratorial conversation between two drug dealers insufficient to link the larger distribution conspiracies in which they were separately involved). Similarly, in *United States v. Glenn,* 828 F.2d 855 (1st Cir.1987), the court reversed the conspiracy conviction of a defendant charged with joining a conspiracy to import and possess marijuana and hashish when the evidence revealed that, although she knew the core conspirators planned to distribute both drugs, she had only helped to smuggle hashish. The court held that her knowledge, coupled with her limited participation, was inadequate to support the inference that she had agreed to further the marijuana smuggling, noting that there was no evidence that the two operations were interdependent or that one facilitated completion of the other. *Id.* at 858 and 859.

Granted, one crime might aid the commission of another, but the point is that we cannot infer that both parties agreed to work together to achieve that result from the fact that they engaged together in some other crime. *Id.* at 859. One may know of, and assist (even intentionally), a substantive crime without joining a conspiracy to commit the crime—witness the landlord who rents to an illegal gambling den, *see United States v. Giovannetti,* 919 F.2d 1223 (7th Cir.1990), and the retailer who sells sugar to one he knows will use it to make bootleg whiskey, *see United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). We cannot, then, reasonably assume that everyone with whom a drug dealer does business benefits, directly or indirectly, from his other drug deals. In fact, any inference should probably run in the other direction. There is—hard though it may be to believe—a finite supply of drugs. Those in the market to sell or buy large quantities (for distribution) are just as likely, if not more, to be competitors as collaborators. Consider, for example, *Fiorito,* 499 F.2d at 109, where evidence suggesting that two drug dealers were competitors influenced our conclusion that "there was nothing to show that [the defendant dealer] was part of the larger conspiracy [of the other dealer] charged in the indictment."

To be sure, the landlord in our example might be liable under civil forfeiture provisions, and, along with the retailer, might be liable for aiding and abetting the substantive offenses, but we do not subject them to additional liability as conspirators simply because they aided the conspiracy and derived a benefit from doing so. "Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy." *Pereira v. United States,* 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954); *see also Nye & Nissen v. United States,* 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) ("Aiding and abetting rests on a broader base [than does conspiracy]; it states a rule of criminal

responsibility for acts which one assists another in performing.").

■ The reason for the distinction is simple. We punish conspiracy because joint action is, generally, more dangerous than individual action. "[W]hat makes the joint action of a group of $n$ persons more fearsome than the individual actions of those $n$ persons is the division of labor and the mutual psychological support that collaboration affords." L. Katz, Bad Acts and Guilty Minds: Conundrums of the Criminal Law (1987); *see also United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir.1986); *Developments in the Law—Conspiracy, supra*, at 924. Both the conspiracy and the market transaction are agreements, but only conspiracy poses the added danger of group action. True, aiding and abetting presupposes the existence of more than one actor, but aiders and abettors are already punished as principals. To justify imposing *additional* criminal liability,[4] there must be some *additional* evidence that their actions are intended to bring about the object of the conspiracy. Conspiracies, which are really "agreements to agree" on the multitude of decisions and acts necessary to successfully pull off a crime, pose an additional risk that the object of the conspiracy will be achieved, and so warrant additional penalties.

■ For this reason, evidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction. A sale, by definition, requires two parties; their combination for that limited purpose does not increase the likelihood that the sale will take place, so conspiracy liability would be inappropriate. *Manzella*, 791 F.2d at 1265. (By contrast, when an agreement requires something more than the simple exchange of drugs for money, such as *obtaining* drugs for distribution—*see, e.g., Manzella*—adding liability to that carried by the substantive offense may be appropriate.) The buy-sell transaction is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction. As we explained long ago in *United States v. Ford*, 324 F.2d 950, 952 (7th Cir.1963), and recently reiterated in *United States v. Kimmons*, 917 F.2d 1011, 1016 (7th Cir.1990), "[t]he relationship of buyer and seller *absent any prior or contemporaneous understanding beyond the mere sales agreement* does not prove a conspiracy.... In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective." The mere purchase or sale of drugs (even in large quantities) does not demonstrate an agreement to join a drug distribution conspiracy "any more than a purchase of 100 tons of steel to build a skyscraper shows that the buyer has 'joined' the corporate enterprise of the manufacturer." *United States v. Baker*, 905 F.2d 1100, 1106 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990).

The analogy to the corporate arena is apt. What distinguishes a conspiratorial agreement from an isolated transaction also distinguishes a decision to incorporate from one to let a contract. In the jargon of economists, business combinations—whether corporations, partnerships, joint ventures, or other variations—exist because they lower the transaction costs of legitimate profit-seeking endeavors. Conspiracies exist for the same reason—to lower the transaction costs of committing crimes. Rather than having "to discover who it is that one wishes to deal with, to inform people that one wishes to deal and on what terms, to conduct negotiations leading up to a bargain, to draw up the contract, to undertake the inspection needed to make sure that the terms of the contract are being observed, and so on," in order to accomplish a goal—whether legitimate or illegitimate—corporations and conspiracies "will emerge to organize what would otherwise be market transactions...." *See* Coase, The Firm, the Market, and the Law

---

**4.** The general rule is that conspiracy does not merge with the substantive offense; both may be punished independently. *Iannelli v. United States*, 420 U.S. 770, 777–78, 95 S.Ct. 1284, 1289– 90, 43 L.Ed.2d 616 (1975). In addition, a conspirator faces the disadvantages at trial noted earlier in this opinion.

at 6–7 (1988). Conspiracies aren't *necessary* to the commission of crime; a single person can commit a crime without any assistance at all, or with the limited assistance of others who do not know of his goal or who have no stake in the success of his venture. But conspiracies are often *convenient* to the commission of crime, because they yield the benefits of group activity that make it more likely that the crime born of a conspiratorial agreement will actually occur than the crime that is the product of individual effort.

A conspiracy "is a partnership in criminal purposes," *United States v. Kissel*, 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910), and "[c]onspirators, like partners, are mutual agents." *Martinez de Ortiz*, 907 F.2d at 632. Conspiracies, like all business ventures, are typically distinguished by cooperative relationships between the parties that facilitate achievement of the goal. *See, e.g., Direct Sales*, 319 U.S. at 713, 63 S.Ct. at 1270 (evidence of "informed and interested cooperation" permitted the jury to take "the [inferential] step from knowledge to intent and agreement"); *Auerbach*, 407 F.2d at 415 (evidence suggested "a close working relationship that belie[d defendant's] claim that he was unaware of conspiracy"); *United States v. Mealy*, 851 F.2d 890, 896–97 (7th Cir.1988) (evidence suggested "an ongoing business" that "contemplated other sales of marijuana ... whenever a shipment came in"); *United States v. Gabriel*, 810 F.2d 627, 634 (7th Cir.1987) (quoting *Direct Sales*). True, any business combination "conceivably could be viewed as a nexus of separate transactions." *Paiz*, 905 F.2d at 1020 n. 4; *see also* L. Katz, *supra* at 264–68 (cautioning that cooperation may exist in the absence of agreement). The reverse, however, is unlikely to be true; higher transaction costs will distinguish most market transactions from cooperative ventures. Evidence that the parties must negotiate the terms of every transaction, seek to maximize their gains at the expense of others, or engage in other forms of opportunistic behavior at the expense of the group, suggests that transaction costs among the group are high and counsel against a finding of conspiracy between its members.

With the foregoing in mind, we turn now to the evidence to determine whether it was sufficient to establish that the defendants agreed among themselves to distribute drugs.[5]

### 1. *Luis Diaz*

 The government presented abundant evidence demonstrating that Apolinar Marquez frequently purchased drugs from defendant Luis Diaz.[6] Marquez frequently turned to Diaz to fill drug orders placed by Special Agent Tommy Wofford, of the Illinois State Police, who was posing as a drug dealer from Minnesota named "Gordon." When Wofford met with Marquez on January 8, 1987, to purchase 12 ounces of heroin, Marquez told him that he had to wait for his "partner" to obtain the drugs. Marquez explained that "the brother of my partner" controlled heroin distribution, while he (Marquez) was "the boss" for

---

**5.** The government's case was built upon conversations recorded via two court-approved wiretaps, one on the phone at Marquez's home, and one on the phone at Luis Diaz's business, the Luis Diaz Auto Body Shop. Our review of the evidence quotes extensively from these conversations, so we note for the reader that the defendants used a crude code when referring to drug transactions in these conversations. "Brown," "commercial," "red Lincoln," and "red Buick" referred to standard quality heroin; "glass" and "black tar" meant a higher quality heroin. "White," "paint," and "girl" referred to cocaine. "Reefer," "weed," "grass," and "Winston cigarettes" meant marijuana.

The use of a common code by all of the defendants may support an inference that they conspired together. *See, e.g., United States v. Grier*, 866 F.2d 908, 922 (7th Cir.1989); *United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986). In this case, however, the generic quality of the terms comprising the code diminish its probative weight in establishing a conspiracy among these defendants. As government agents testified when explaining the code, these terms are used commonly by drug dealers.

**6.** Diaz did not work exclusively with Marquez however. Through use of a wire tap of the phone at Diaz' auto repair garage, the government recorded Diaz arranging a cocaine transaction with Clounia Carr, who was also indicted as a member of the conspiracy.

cocaine deals. After telling Wofford to meet him later in the afternoon, Marquez was seen at Diaz's auto repair garage at least 3 times later that afternoon. This transaction between Marquez and Wofford never materialized, but Diaz did supply 6 grams of heroin to Marquez on March 27, 1987, enabling Marquez to sell the heroin to Agent Wofford. (Marquez had been unable to obtain the heroin from another source earlier that day.) Diaz was present in Marquez's car when the sale was made in the parking lot of a McDonald's restaurant in Chicago. When Agent Wofford sought to buy 5 ounces of heroin from Marquez in April, Marquez called a number of sources, including Diaz:

Diaz: How many?

Marquez: Five.

Diaz: Uhm!

Marquez: Five boxes.

Diaz: No, at this time, I can't.

Marquez: Hum?

Diaz: You know, it's too much, I can't do this.

Marquez: Okay.

Diaz: Maybe next time.

Marquez: Okay.

Marquez did call Diaz the next time Wofford ordered drugs, on June 17, asking for half a kilogram of cocaine. When, on the morning of June 18 Diaz failed to provide the cocaine on time, Marquez threatened to get it from someone else. Diaz responded, "Damn, no.... I've already ordered it." Marquez did call another supplier, Hugo Santos, who agreed to supply Marquez within 20 minutes. Santos also failed to show, however; Diaz may have ultimately supplied the cocaine for this deal because he was spotted later that day leaving Marquez's house carrying the bag in which Agent Wofford had placed the money he paid to Marquez. Still later that day, the government's wiretap picked up a cryptic conversation [7] between Diaz and a garage employee, Luis Albert Rivera, in which Diaz told him:

Damn. Who the hell was it who told him I was doing that business? Who was it he told me—that there was someone he had told. Damn, Albert. I think—I think I'm going to jail, you know, Albert? I think we're going to jail, you know? Damn, man, with the business we did for Apolinar, brother. With the business we did for Apolinar."

Despite these concerns, Diaz continued to do business with Marquez. After Agent Wofford called Marquez on June 23 to order 2 kilograms of heroin, Diaz again agreed to supply Marquez with the drugs. Once again, however, Diaz had trouble obtaining the drugs. Diaz spent most of the day on June 26, the day Wofford and Marquez set for the buy, trying to locate the drugs; Marquez spent most of the day trying to locate Diaz. One conversation between the two is sufficient to convey the state of their relationship on that day:

Marquez: You'll be here very soon?

Diaz: Yes.

Marquez: Are you telling me the truth or a lie?

Diaz: No, this is a—a serious thing, listen.... They put a young guy to wash the car, right? And they left the hose on and everything got soaked. They are drying the rugs and all that shit there.

Marquez: No, man, I can't tell the people a story like that man! ... How long until you're here at the house, man?

Diaz: Uh, it won't take less than thirty minutes to get there.

Marquez: No, man, it can't take that long, man.

Diaz: Uh-huh. That's fine.

Marquez: But what is fine, Luis? Speak to me clearly, man. (Pause) Speak to me clearly.... Listen, I don't want this bullshit. Damn, I'm ashamed, man.

Diaz: All right. I'll be there very soon. Tell him not to worry.

. . . . .

---

7. The defense objected to the introduction of this conversation because it had not been preceded by a phone call. Apparently, the phone was off the hook, or otherwise engaged, when Diaz made these statements. The admissibility of this evidence is not contested on appeal.

Marquez: But listen to me Luis. This isn't a game, this is since nine, since nine this morning, Luis. Then at four, and at four, its six—five thirty. It's quarter to six now, Luis.... The next time there's not going to be anything, because I can't be having these problems, man.

Diaz: No, no, no, no. Don't say that.

Marquez: No, no. No way, I can't be looking bad with this person that—that is waiting for this car all this ti—all this time there. This is not being considerate.

Despite Marquez's best efforts, however, he failed to get the heroin to Wofford, who left the Shamrock motel, where he had been waiting, at 7:30 p.m. Diaz ultimately produced the drugs, but not until almost 8:00 p.m. This failure may have damaged the relationship between Marquez and Diaz beyond repair, because the government presented no further evidence of transactions between the two.

This evidence clearly establishes that Diaz conspired with Marquez to distribute drugs. Diaz had no interest in Marquez's activities, however, beyond occasionally obtaining drugs for Marquez. He knew that Marquez had extensive drug dealings beyond those in which he was involved (and he had separate dealings as well), but that knowledge alone did not make him a coconspirator with those involved in Marquez's other deals. The evidence does not suggest that Diaz was in league with Marquez's other suppliers, for example; rather, it shows that he was competing with them.[8] Their gain was his loss. Marquez frequently threatened to take his business elsewhere, a prospect Diaz did not view with the equanimity of a partner. Instead, Diaz protested emphatically: "No, no, no, no. Don't say that." On other occasions

he pleaded with Marquez to give him another chance. On still another he protested: "Damn, no.... I've already ordered it." Diaz was clearly concerned about his own financial prospects, not those of Marquez and his other suppliers. The government presented no countervailing evidence to suggest that, his protests notwithstanding, Diaz somehow benefitted when Marquez took his business elsewhere, and we can think of none. Yes, by utilizing other suppliers, Marquez survived to buy again another day, but probably not from Diaz. After Diaz failed to deliver the drugs to Marquez on June 26, Marquez told him: "Never in my life. Never in my life will a thing like this ever happen to me. Never again. You can be sure that it won't happen again." The government suggests that Diaz was the "partner" Marquez spoke of to Agent Wofford, but the evidence suggests otherwise. Partnership implies a joint stake in the success of an enterprise, and it is clear that Diaz's interest in Marquez did not extend to Marquez's future or his other confederates.

### 2. "Changa"—Joseph Angel Claudio

 Part of the difficulty Diaz encountered when supplying Marquez with drugs stemmed from the problems he experienced with his own supply source. Joseph Angel Claudio was Diaz's primary, if not exclusive, source of drugs. Claudio was part of a chain of supply that ultimately extended to Marquez and his customers, but that chain hardly fits the picture of the ongoing distribution chain that gave rise to the paradigm of chain liability. Claudio's involvement was sporadic, and the government presented no evidence suggesting that he knew anything of, or had any interest in, the success of Marquez's operations. Indeed, there is nothing from which a jury

---

**8.** That at least some of Marquez's suppliers were "independent" operators is suggested by other evidence. In a conversation with Agapito Sanchez, for example, Marquez asked:

Marquez: And couldn't there be even a—even a twenty-five reduction for me?

Sanchez: Oh, God, man, that's the lowest. That's the minimum.

Diaz, too, haggled over price with Marquez. *See infra* at 1398. In light of evidence like this

suggesting that Marquez had to try and negotiate with suppliers for price, it seems unlikely that all of the suppliers were in league with one another to market drugs through Marquez. *See, e.g., United States v. Whaley,* 830 F.2d 1469, 1473 (7th Cir.1987) (price standardization of drugs among defendants cited as evidence of a single conspiracy).

could have inferred that Claudio knew that the distributor with whom Diaz was dealing also dealt with suppliers other than Diaz.

At the same time, the evidence suggests that Claudio had little interest in forging the distribution chain into a more cohesive operation; he showed a curious lack of concern about the predicaments his delays imposed on Marquez—an indifference that belies any inference that Claudio was in a partnership with Marquez. Claudio's responses to Diaz's efforts to obtain drugs to sell to Marquez on June 26 demonstrate the latter's seeming indifference to Marquez's problems:

> Claudio: Well, that'll have to be taken care of, because I don't have that amount.
>
> Diaz: How long ... eh ... You think that ... eh?
>
> Claudio: For when?
>
> Diaz: For now.
>
> Claudio: For right now? Right now?
>
> Diaz: He's been calling since this morning.
>
> . . . . .
>
> Claudio: Well, if—if you tell him four in the afternoon, that's fine.
>
> Diaz: All right.
>
> Claudio: But tell him, because I'm not going to—to waste—go there to waste—make that waste.
>
> Diaz: Well, let me call him and tell him at—at four.
>
> Claudio: If he says yes, tell him yes. If not, then, no.
>
> Diaz: And how much could those people be paid per hour?
>
> . . . . .
>
> Claudio: Well—I'll—I'll let it go to you— that is—if you—you—I'll give you the contract, and you talk to them—See if you can make two or three bucks.... And I'll give it to you for twenty bucks.

After this conversation, Diaz called Marquez and told him that he could not get the drugs before 4:00 p.m. and that the 2 kilos would cost "twenty-two" each, or "forty-four" together. Marquez had quoted Wofford a price of "twenty-nine" for each kilo, leaving a substantial profit on each sale, but he nonetheless protested about the price to Diaz, who was unwilling to lower it much more:

> Marquez: —when those people called me they said they'd be here at nine. That's why I told you to be here at nine. I could have taken another route, but now—look at the time it is and I'm stuck in this mess—and you know—I even counted those people's pieces/parts [money] already—which they have in their hands. Because I had already given the same price you gave me before.
>
> Diaz: Look, sir—do you remember that I had based it on that? It can't be done for that. It would be—uh—at least forty three.

Later, at 6:00 p.m., Diaz was still trying to get the drugs from Claudio:

> Diaz: But he is waiting for me.
>
> . . . . .
>
> Claudio: Oh! I'm going over there now. No—uh—give me another 30 minutes. Okay?
>
> Diaz: Uh—the man shit in his pants. Anyway ... I told him thirty. All right.
>
> Claudio: I'll call you right back.

Claudio, however, never called back; an associate finally called Diaz almost two hours later to tell him that the drugs were ready for him to pick up.

Claudio obviously knew that Diaz was reselling the drugs in bulk, but the government presented no evidence indicating that he had any stake in the subsequent distribution of those drugs. As with Diaz, the government's evidence proved only that Claudio knew that the drugs he sold to Diaz were going to continue on in the stream of commerce; it does not establish that he had any interest in whether those with whom Diaz dealt—principally Marquez—were successful or not. In fact, his advice to Diaz that he try and "make two or three bucks" on the sale of each kilo suggests that he, like Diaz, was unconcerned with the interests of those further down the chain of distribution.

### 3. *Orlando Nunez*

■■■ *Someone* named Orlando Nunez supplied drugs to Marquez. The government says that it was the defendant by that name; the defendant says that it was his cousin, Jose Orlando Nunez, who went by the same name, "Orlando," and who was employed as a manager of the defendant's business, the Old Style Body Shop. Nunez contends that the evidence linking him to the conspiracy was insufficient, in part because of the possibility that the voice identified as his on the tape actually belonged to his cousin, Jose Orlando. We are ill-equipped to review this aspect of the dispute, since it rests largely on the credibility of the witnesses who identified the voice at trial.[9] Both sides presented witnesses supporting their view as to the identity of the speaker, and the jury chose to believe the government's. Since we cannot say, on the basis of the record, that it was unreasonable for the jury to have done so, we will not disturb its conclusion.

Accepting that it was the defendant's voice on the tape, it seems clear that he conspired with Marquez to distribute drugs. During a five day period in June, from the 11th until the 16th, the government recorded a number of conversations between Nunez and Marquez. Some of these clearly involved drug transactions:

Marquez: Tell me.

Nunez: I couldn't find that man.

Marquez: Oh, no?

Nunez: No. I can't find him anywhere—the man. I failed you without wanting to.

Marquez: Huh?

Nunez: I failed you without wanting to.

Marquez: Oh. You think you could see him today?

Nunez: Yes. Maybe tonight I'll see him, but since I failed you, I don't want to fail you, you see.

Marquez: Yes, so, you'll call me then, when—

Nunez: As soon as I locate him.

Marquez: And the white car?

Nunez: We'll—it's also the same man.

■■■ Nunez characterizes his conversations with Marquez as preliminaries to a drug deal, and cites *United States v. Melchor–Lopez*, 627 F.2d 886 (9th Cir.1980), for the proposition that such conversations are insufficient to establish a conspiracy. But *Melchor–Lopez*, like our own opinion in *United States v. Podolsky*, 798 F.2d 177 (7th Cir.1986), dealt with *conditional* agreements, and there was nothing conditional about Nunez's agreement to work with Marquez. True, in his own words, he "failed" Marquez, but he did so *"without wanting to."* Nunez is confusing failure to perform with reluctance to perform; only the latter is relevant to the question of whether a conspiracy existed, because the offense of conspiracy is complete at the time of agreement, whether or not its object is ever achieved. *United States v. Rosengarten*, 857 F.2d 76, 79 (2d Cir.1988), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989).

Although the evidence established that, at some point, Nunez conspired with Marquez, it fell short of establishing that their conspiracy was ongoing or that it involved everyone else with whom Marquez did business. Like defendant Claudio, Nunez had apparently had little concern about Marquez's business troubles. On June 12, for example, Marquez placed an order with Nunez:

Marquez: I need the white one. One by six o'clock. ... A little bitty one.... For eight.

Nunez: Well, that bastard doesn't get in until night time.

Marquez: Listen—but Orlando—listen to me. I can't fail these people. If I fail these people after I already spoke with those people, that's a fuck up, man.

---

**9.** We do note that, at one point, "Orlando" said to Marquez: "I'm going to be at *my* garage at one." The evidence established that the Old Style Body shop belonged to the defendant. Moreover, in another call, an associate of Luis Diaz's told Diaz that the defendant Nunez was on his way to Diaz's garage, driving a Mercedes. "Orlando" called Diaz's garage a few minutes later, telling Diaz that he was running behind schedule because his Mercedes was stalling.

Nunez: Well, it's just that they're fucking with me over here—on this side, you see?

Marquez hounded Nunez for several days; by the 15th, Nunez was getting hostile:

Marquez: Listen.

Nunez: Listen, don't fuck with me any more.

Marquez: I'm on my way over there. Wait for me there. Don't go anywhere.

Nunez: What the hell are you coming over here for?

Perhaps recognizing the need to demonstrate some form of continuing interdependence between Marquez and Nunez, the government claims that this and other conversations show that Marquez owed Nunez money. There is nothing in these conversations, however, to support that characterization.[10] At most, this evidence shows that Nunez was a potential source of cocaine to whom Marquez turned periodically. None of their conversations suggest any degree of mutual interest in the affairs of the other beyond their agreement to obtain drugs on several different occasions. These conversations suggest just the opposite; Marquez and Nunez each had distinct problems—Marquez in customer relations, and Nunez with his suppliers—but it does not suggest that the problems of one were of concern to the other beyond their impact on the transaction at hand.

The government did present evidence that defendant Luis Diaz owed Nunez money, but failed to introduce any evidence at all that the debt was drug-related. Since there was no evidence tying this debt to a drug transaction, it does little to establish Nunez's membership in a drug conspiracy. The mere fact that Nunez knew both Diaz and Marquez adds little to the force of the government's argument, because it does nothing to establish that Nunez knew that Diaz also supplied Marquez with drugs.

We might suspect this, but mere suspicion cannot sustain a criminal conviction. And even had the government shown that Nunez did in fact know of deals between Marquez and Diaz, it did nothing to show that Nunez had any interest in furthering the success of those ventures.

### 4. "Roxie"—Dorothy Taylor

■ Her protests notwithstanding, the government provided ample evidence to prove that defendant Taylor bought marijuana from Marquez to resell to her own customers. A snippet from one of their conversations suffices to make the point:

Taylor: Make it, make it twelve, I want twelve.

Marquez: Twelve?

Taylor: Yeah.... O.K., listen Marquez.... Tell him, the last time that weight wasn't right.

Marquez: Oh, I tell him now.

Taylor: O.K. Wait a minute, I had a lot of complaints, about the weight. Tell him to make sure that weight's right, if they ain't going to give ...

Marquez: O.K., I tell him right now, now, put it, let it be more.

Taylor: O.K., tell him, make sure it's right now, because I'm, I'm way behind, and them people be calling back.

Marquez: No, I don't like you complain, because you know you, you lose, me I lose you, too.

This evidence was sufficient to establish an agreement between Taylor and Marquez to distribute marijuana. Taylor placed orders for drugs, which Marquez then had to obtain through his own sources; the scope of the transaction therefore transcended the exchange of drugs for money that characterizes a simple buy-sell transaction that, standing alone, is insufficient to support a conspiracy conviction. Moreover, although Marquez was little more to Taylor than—in

---

**10.** The government also maintains that conversations between Marquez and Nunez on June 15 and 16 related to drug transactions, but we do not find any support for that characterization. The conversations purported to concern the sale of Nunez's body shop to a group of "Mexicans," and neither Marquez nor Nunez appear to have

employed the drug code that pervaded some of their other conversations. Without more than a reference to nationality, we cannot say that a jury could reasonably accept the government's characterization of these conversations, and we therefore disregard them.

Learned Hand's words—"an independent peddler of narcotics," selected because he was "the most immediately available source of supply," *see United States v. Reina*, 242 F.2d 302, 306 (2d Cir.1957), he knew that she was buying for resale and acknowledged his own interest in her success. In turn, Taylor's own success hinged on Marquez's ability to obtain the marijuana from his suppliers.

Taylor's relationship with Marquez, however, did not last long. After their first deal, for example, Marquez tried to increase the price; Taylor would have none of it, and Marquez had to back down:

Marquez: Let it be more, you know. Let it be my special price. Let it be more money. I don't know. See how you like it.

Taylor: Uh, I ain't got no more money, man. I'll go get it from my old dude. I'm not gonna pay no more. Fuck that.

Marquez: Yeah, I know, but it is a piece good.

Taylor: No—

Marquez: Like he got it good.

Taylor: No—I'm not gonna—

Marquez: No! I no (UI) for the piece because you do it!

Taylor: Uh-huh!

Marquez: I tell another guy!

Taylor: Uh-huh. I don't want it then.

Marquez: Oh—

Taylor: I'll go get it from somebody else. 'Cause I can get it from—

Marquez: No, no, no baby! You no understand what me said.

Taylor: No—

Marquez: Everything is all right! He got the same price!

Taylor: Oh, same price, huh?

Marquez: Yeah, yeah. No, no don't confuse.

Taylor: Oh, oh, I'm confused (laughs), oh, okay.

Marquez: (Laughs) Don't confuse—

Taylor: Don't confuse me that way—

Marquez: No, no, I don't confuse you, no, no (laughs).

Taylor: (Laughs) Hell, no, don't confuse me, 'cause I'll go somewhere else (laughs).

Marquez: (Laughs) No, no, no, I know! You become rough now! (Laughs). You come rough! (Laughs). You need to make it quick.

Later, when she wasn't satisfied with the quality of marijuana Marquez obtained for her, Taylor decided to carry through with her threats to take her business elsewhere:

Taylor: I don't want this shit, I don't like that, man, I told you I don't like it.

Marquez: Man, you wrong, you check it out right!

Taylor: No, man …

Marquez: You wrong!

Taylor: No, you wrong.

Marquez: No!

Taylor: I don't want this shit.

Marquez: (UI) 'cause you wouldn't pay!

.　　.　　.　　.　　.

Taylor: You all, you all losing a good customer, man, fucking around; you losing …

Marquez: … You losing my business.

Taylor: Hm, I lose a customer … You lost a good customer.

Marquez: You losing my business …

Taylor: Hmm, I'm not going to mess with you no more, man, cause …

Marquez: No, no, but you're losing me …

Taylor: … Mix that shit …

Marquez: No, no, hey … hey …

Taylor: … mix it with that garbage …

.　　.　　.　　.　　.

Taylor: OK. Then I'll go with (UI) deal with my people. I'll deal with the people I been dealing with …

Marquez: Oh, OK, for go ahead.

These conversations with Marquez graphically demonstrated that Taylor's commitment to Marquez and his marijuana suppliers did not carry over from one deal to the next. Her conspiracy with Marquez was more limited in scope. *Compare Auerbach*, 913 F.2d at 415, where we held that the defendant conspired with a large distribution organization, in part, because

"[h]is purchases were not discrete transactions ... [but] required an ongoing relationship that soured only when [the defendant] failed to move the marijuana fast enough...." In contrast, the Taylor–Marquez partnership soured after their first deal; the second brought new negotiations, complaints, and a parting of the ways. Conspirators, of course, may come and go; the fact that they withdraw from an ongoing conspiracy does not mean that their original agreement was limited in scope. *See, e.g., United States v. Sophie*, 900 F.2d 1064, 1081 (7th Cir.1990). But limited participation can be probative of limited agreement, and in this case it is. Taylor's transactions with Marquez do not evidence any intent to cooperate in the larger, ongoing conspiracy described in the indictment, and it would therefore be unreasonable to infer that she conspired with each of her codefendants.

The government's evidence against Taylor fell short in another respect. Taylor clearly had nothing to do with the distribution of cocaine or heroin. Nevertheless, citing *United States v. Beverly*, 913 F.2d 337 (7th Cir.1990), the government contends that Taylor's conviction is valid even though her activities were limited to marijuana. We will discuss *Beverly* in conjunction with defendant Townsend's challenge to his telephone facilitation conviction, but find it unnecessary to do so here. Taylor was not charged with separate acts in a single count; she was charged with the single act of conspiring to distribute a controlled substance. The type of drug charged in the count is immaterial; the critical fact is that the substance is controlled, not that it is one variety or another. Taylor could have been convicted of conspiring to violate § 841(a) had the government failed to prove that she was involved with cocaine, heroin, *or* marijuana, had it proved she was involved with some other illegal substance.

That assumes, of course, that the evidence showed that others were involved with the same substance. The breadth of § 841(a) does not obviate the government's obligation to show that Taylor conspired to violate § 841(a) with the group named in the indictment. In that regard, the government failed, and failed dramatically. The government presented no evidence to tie Taylor to those with whom Marquez conspired to distribute cocaine and heroin. In this respect the government's case against Taylor is even weaker than was its case in *United States v. Glenn, supra*. There the First Circuit reversed the conviction of a defendant found not to have joined an agreement with a group of conspirators to distribute marijuana, even though she had conspired with the *same group* to distribute hashish, because the record did not reveal that the defendant shared the dual objective of the core conspirators. 828 F.2d at 859. We applied the same reasoning in *United States v. Pallais, supra*, to uphold the convictions of two defendants who were each charged for participating in separate conspiracies to import marijuana and cocaine rather than in a single conspiracy to import both. Taylor's appeal in this case proves the point we made there, namely, that had all the defendants "been joined in one giant conspiracy, they would have howled." *Id.* 921 F.2d at 686. At argument, the government asserted that Taylor should have known that Marquez also dealt in drugs other than marijuana, but we see no basis for imputing that knowledge to her. *See id.* ("Marijuana and cocaine are different drugs in terms of sources, channels of distribution, methods of shipment and processing, and customers.") And even if we did, that knowledge alone is not probative of her agreement to join those other ventures; the record is simply barren as to Taylor's interest in Marquez's cocaine and heroin ventures. We conclude, therefore, that although Taylor conspired with Marquez to distribute marijuana, she did not join the multifaceted, ongoing conspiracy detailed in the indictment.

### 5. *Mason Townsend*

 As Townsend candidly concedes, the eight phone calls between Marquez and him "support the proposition that Mr. Townsend knew Marquez was selling drugs." No other conclusion is possible since, on June 11, 1987, Townsend himself

told Marquez that he knew some people who wanted to buy some heroin:

Townsend: Uh, uh, that brown. I got some people that, that want some. You, you got it?

Marquez: What kind, what I think, uh, the cigarette? ... The Winston?

Townsend: The brown Buick.... You got it?

Marquez: By tomorrow. Not now! ... You, you got glass?

Townsend: I don't know what, they, they, they's from out of town.

Marquez: You want it now?

Townsend: Yeah, they wanted it now.

Marquez: Ah, you got it if you want it now! ... You got it!

Townsend: Uh, the brown Buick?

Marquez: Yeah, the brown Lincoln!

Townsend: The Lincoln, yeah!

Marquez: You say the people ready.

Townsend: The only about it that they want to check it out, you know?

Marquez: Yeah, but the people ready?

Townsend: No, yeah, they ready.

Marquez: Eh, they ready for buy the Lincoln?

Townsend: Right.

The parties disagree, however, about whether this conversation establishes that Townsend intended to purchase heroin to resell to his friends or whether he was merely acting as an intermediary between a willing buyer and seller, a status some circuits have found inadequate to support a conspiracy conviction. *See, e.g., United States v. Tyler*, 758 F.2d 66, 69 (2d Cir. 1985). Even giving the government the benefit of the doubt, as we now must in light of the jury's verdict, we cannot say that it would be reasonable to infer from this conversation that Townsend was seeking to purchase heroin to resell to his own customers. As the last few lines of the conversation reveal, the mystery customers, not Townsend, were going to buy the heroin. Marquez wanted to make sure that *they* were ready to deal, not Townsend. Townsend's role was confined to bringing the parties together.

We have affirmed conspiracy convictions in the past where the defendant played a significant role in facilitating a drug transaction between others. *See, e.g., United States v. Cea*, 914 F.2d 881, 886–87 (7th Cir.1990); *United States v. Manzella*, 791 F.2d 1263, 1265–66 (7th Cir.1986). Even under this less exacting standard, however, the evidence was insufficient to convict Townsend of conspiring to distribute drugs. In both *Cea* and *Manzella* we emphasized the lengths to which the defendant went to assure that the transaction took place. "No one," we said of defendant Cea, "could have tried any harder ... to culminate the deal." 914 F.2d at 887. By contrast, Townsend was positively indifferent. After initially broaching the subject with Marquez, Townsend seemed unwilling to do anything to bring the parties together. Marquez was eager to accommodate, and repeatedly suggested a meeting, but Townsend demurred:

Marquez: Uh, what time you want?

Townsend: Uh ... call me after the ball game.

Marquez: Oh, I don't know mother fucker goddamn about a game. I don't watch them goddamn ...

. . . . .

Marquez: Okay, for you get, what time you want to go? It's now about nine-thirty ...

Townsend: Uh, well, uh ...

Marquez: About what time?

Townsend: About ten-thirty.

Marquez: About ten-thirty you call me?

Townsend: Yeah.

Townsend never called Marquez, however, and the government presented no evidence that the sale ever took place. Given this evidence we cannot say that Townsend played a significant role in *facilitating* the transaction; indeed, he seems to have been largely responsible for *preventing* it.

Townsend's lack of interest in bringing the deal off may have been due, in part, to the fact that he initially brought the subject up in order to deflect Marquez's anger over Townsend's nonappearance at a ren-

dezvous the two had scheduled for the previous evening:

> Marquez: What happened you last night, big nigger. Me get home at ten o'clock, see you in the Mercedes. I come over there. I wait for you, goddamn it, till twelve o'clock.
>
> . . . . .
>
> Townsend: I, I forgot about it....
>
> . . . . .
>
> Marquez: I need a help, man, I need a fix the goddamn, fucking problem I got, man.
> Townsend: Hey!
> Marquez: Yeah?
> Townsend: Uh, uh, that brown. I got some people that, that want some. You got it?

We conclude, therefore, that Townsend did not conspire to distribute heroin. We also note that, even were we to conclude that the government's interpretation of Townsend's conversations with Marquez was reasonable, we would still be compelled to conclude that Townsend did not conspire with each of Marquez's suppliers and customers. The government failed to establish any connection between Townsend and the conspirators charged in the indictment. Townsend knew that Marquez was a member of a narcotics distribution chain, but there was no evidence that he was working to further their interests as well as his own:

> Marquez: Yeah ... where are you ... wanna ... you ready, something, today, I want to go warehouse for the 'nother, for the, the another thing; you remember me telling you? ... I wanna hear si [if] you got something for six o'clock; I wanna go to warehouse.... I supposed to take care of the warehouse rent.... You beeping me six o'clock?
> Townsend: Yeah.
>
> . . . . .
>
> Marquez: Okay. Try ... maybe, 'cause I wanna go warehouse today.

> Townsend: You want to go away?
> Marquez: No, in a warehouse, warehouse! Another, another paint, white paint.
> Townsend: Oh, huh?
> Marquez: Ah, white paint, you remember me telling you?
> Townsend: Yeah.
> Marquez: So me wanna go get ah, my, my, my white paint.... But I'm supposed to go and take care of the warehouse rent.

We agree with Townsend's characterization of this conversation,[11] admitting that it is reasonable to infer that Marquez was telling Townsend that he needed money to pick up cocaine. But there was nothing in this conversation to suggest that Townsend had any stake in the successful distribution of Marquez's cocaine; "the conversation evidenced Marquez's sense of urgency, contrasted with Mr. Townsend's indifference to that sense of urgency." Townsend Br. at 14. Townsend bought from Marquez sporadically, when he had cash and needed drugs, and knew little of Marquez's dealings with others:

> Marquez: You know how much me pay today?
> Townsend: What?
> Marquez: Fifty-two hundred.
> Townsend: You're lying.
> Marquez: In the warehouse. In the warehouse; I go in the bank, taking my wife, pick it up fifty-two hundred dollars, pay the warehouse, you know the ... for merchandise, for picking up my big piece tomorrow.
> Townsend: Uh, yeah?
> Marquez: I getting my big piece tomorrow, see, 'cause if you needing something, you let me know.
> Townsend: I, I ...
> Marquez: The white?
> Townsend: The white?
> Marquez: Yeah.
> Townsend: Alright.
> Marquez: The white car.

---

11. The jury acquitted Townsend of Count 53 of the indictment (use of a telephone to facilitate a drug transaction), which was based on this conversation.

Townsend: Uh huh.... Well, I, I, I'll probably see you tomorrow then, some time. Call me, call me early in the morning.[12]

Moreover, it is not clear whether Townsend generally bought for resale or personal use; the only evidence that Townsend resold drugs he purchased from Marquez was the ambiguous conversation of June 11, quoted above. Evidence of personal purchases from Marquez adds little weight to the government's case. *Cf. United States v. Quintana,* 508 F.2d 867, 880 (7th Cir.1974). And even if it could be said that Townsend's purchases somehow inured to the benefit of all of Marquez's drug sources, the government would still have to prove that Townsend was in league with Marquez's other customers, like defendant Dorothy Taylor. The government hasn't explained any link between Townsend and Taylor, other than the fact that both used Marquez as a source of drugs. Neither was a Marquez employee; neither distributed drugs at Marquez's behest.

### 6. *Carlos Mejia*

■ Marquez also obtained drugs from defendant Carlos Mejia. The government recorded numerous conversations concerning drug transactions between the two, they met together frequently, and Mejia made a drug pick-up at Marquez's home. When Mejia was arrested at his home on February 18, 1988, someone threw a bag containing over $90,000 in cash out of a second story window. A search of the house revealed another $22,000 in cash.

Unlike the evidence relating to other Marquez suppliers like Diaz and Nunez, the conversations between Marquez and Mejia suggest that the two coordinated their respective activities to a large extent, and their deals seemed to run smoothly. On April 3, 1987, Mejia called Marquez, who told him that he was "going to see the people I told you about.... Because they told me last night that it was a little high, and this—and—that, but then they agreed

to see me at two." A few days later, Marquez informed Mejia:

Marquez: I'm waiting for the people to call me—some people from Minnesota [Agent Wofford].... And they left word for me at home, but I wasn't in.... So, I don't know what time they'll get here. They said they had left for here. Because the people from Las Vegas haven't arrived yet.... But don't worry because all that is leaving this week."

Mejia: Oh, I hope so, because—

Marquez: I'll call you right away, don't worry, because the thing is there are people who have the money in cash, and what other people do is move it fast.

Mejia: Okay. Call me today so we can begin with the other thing because the thing is that it's arriving on Friday."

On April 14, Mejia called Marquez:

Marquez: [I]n a while I'll be going to—at 1:30 I'm heading south to see the other people. ... But first I want to bring you some money.... Then, I'm going to check out two people that called me last night.... Then, whatever I pick up today, I'll call you right away so you can pick it up.

Mejia: Oh, I was going to ask you whatever happened to the man with the car? With the friend, Tony?

Marquez: I don't know. I see him around. He is going to pay. He is going to pay.... I'm in a hurry because the other people of the white paint are calling me all the time."

Mejia: Ah, no, but within two days—we already—we already ordered it, so, in two days I'll take care of you.

Marquez: No, no, don't worry about that; that will go right away now, but the thing is that the people have me dry, and the man over there—I will talk to him. I'll—I'll also tell you how much he is going to pay you weekly.

---

**12.** The jury acquitted Townsend on Count 63 (use of a telephone to facilitate a drug transac-

tion), which was based on this conversation.

Later the same day, Marquez and Mejia continued to coordinate their affairs, including payments for drugs:

Marquez: So, I'm going to arrange with them to see what they need for tomorrow.... But don't worry, the other thing is all right.

Mejia: No, I was calling you because—it's just that I didn't understand you. Tell me something, do you still have some over there?

Marquez: Of what?

Mejia: Money.

Marquez: No, man, that just started yesterday.

Mejia: No, the thing is that I need a little money to send it right now, because that other thing is about to come in.

Marquez: Well, but then wait until tomorrow.

Mejia: No, because it has to be today. But I'll try to get it somewhere else.

On May 1, Mejia called Marquez:

Marquez: I'll call you in an hour—a couple of hours.

Mejia: Yes.

Marquez: To tell you what I picked up there. Or if not, I'll take one of the parts back or—or how do you want to handle this? Should I wait until Monday—after the weekend, or what?

. . . . .

Marquez: So, I'll call you so you can pick it up and, if you want to—give people a chance—three or four days more, because some people like the car and others don't.

Mejia: Alright. But pick up something for me anyways because—

Marquez: Yes, yes, no, no, no forget it, that's on its way.

Mejia: That guy is here.

Marquez: So, I'll call you because I want to start with the other one today because I'm—I'm in a noose.

Mejia: I need to go. So, I need to leave you my car so you can fix it.

Marquez: Yes, I'm in a noose. Well, that's what I want to go pick up.

Particularly when contrasted with the often heated exchanges Marquez had with Diaz and Nunez when pressured, the exchanges between Marquez and Mejia suggest that more cooperation and mutual involvement characterized their relationship than those of Marquez and some of his other suppliers, like Diaz and Nunez. When Marquez was rushing to find marijuana to replace the "weed" Dorothy Taylor rejected, for example, Marquez called Mejia:

Marquez: Listen, I'm going to need ten, and not too late.

Mejia: Huh?

Marquez: I'm going to need ten, but I have to go out now because I want to pick up some of your money I have over there.... What time can you have it for me?

Mejia: A little later.

Marquez: What time?

Mejia: It's just that this guy—I think by tomorrow, because this guy left.

. . . . .

Marquez: Oh my God. I need it for at least about four, man.

Mejia: Oh shit.

The evidence supports an inference that Mejia had a stake in the success of Marquez's activities. Their transactions reveal that Mejia often fronted drugs to Marquez without receiving immediate payment; often they had more than one deal brewing. The nature of their relationship suggests a substantial degree of cooperation and partnership rather than a series of isolated and sporadic transactions. The nature of their relationship suggests not only that each knew that the other had a network of drug associates, but also that each was committed to maintaining their successful business relationship. These facts distinguish Mejia from Diaz and Nunez, and were sufficient to enable the jury to infer that Mejia had agreed to work with Marquez to distribute a variety of drugs on an ongoing basis.

### 7. *Isabel Marquez*

█ The government portrayed Isabel Marquez as her husband's partner in crime; she insists that she was nothing more than

an answering service. The evidence supports the government's view. A review of several of Apolinar's transactions suffice to demonstrate that Isabel knew exactly what she was doing when she aided her husband.

Isabel was intimately involved in at least three of Apolinar's transactions with Agent Wofford. On April 21, 1987, Wofford placed an order with Marquez for five ounces of heroin. Twice during the day Wofford spoke with Isabel on the phone. At 11:22, he told her:

Wofford: Yeah, I'll be waiting for him at the McDonald's. Do you know if he's going to be able to get it together?

Isabel: I don't know. I call ... to him.

Wofford: Page him and uh tell him you know if he is having trouble you know, if it's going to be longer than you know the 45 minutes he told me earlier that you know come talk to me, and we'll make some adjustments you know.

Isabel: Oh!

Wofford: Okay?

Isabel: Okay.

Later that afternoon, Wofford called again:

Wofford: I am waiting—have you heard, I just talked to him, and he hung up on me right quick. He said he was on his way. Is he having any trouble or something?

Isabel: Uhm ... he's waiting for the people.

. . . . .

Wofford: Okay. Tell him I'll be gone you know. I told him I would wait 45 minutes you know, and that's about 2:30 and I'll be gone. Okay?

Isabel: At 2:30?

Wofford: Yes, so tell him to hurry up.

During Marquez's second transaction with Agent Wofford, for example, he had to try and locate an alternative source of cocaine when Luis Diaz was late. Marquez called another supplier, Hugo Santos, who agreed to meet Marquez on the street with the drugs shortly thereafter. Marquez then called Wofford, waiting at the Shamrock motel, telling him that he would be there with the drugs in an hour. Santos failed to show up at the arranged place and time, however, and Marquez called Isabel at 9:59, giving her Santos' beeper number and a number where Santos could reach him. A few minutes later, he called Isabel again, telling her:

Marquez: Honey, this guy hasn't called me. Listen to this. Dial the number I gave you 936–9151.

Isabel: Uh huh.

Marquez: And dial the number of our house first. And after that, dial the number 6. It's the code. Okay? ... Dial the number of the house two times and dial this number here two times and then dial the number 6. This bastard hasn't come, if not I'll have to go some other place.

Just afterwards, Diaz called Marquez's house and Isabel gave him the number Marquez had just given to her. At 10:20, Marquez called Wofford to tell him that he would be at the Shamrock at 11:15. But at 11:09, Wofford called Marquez's home and spoke to Isabel:

Wofford: Is Marquez there?

Isabel: Who is speaking?

Wofford: Gordon.

Isabel: Oh! It is Gordon. He in the, in ... he is not here.

Wofford: He's not here?

Isabel: No.

Wofford: Okay.

Isabel: Okay. You waiting for him, okay?

Wofford: Yeah. If you contact him and tell him to hurry up or, hu, contact me and tell me what's going on.

Isabel: Okay.

Isabel had to help Marquez locate a supplier the next time Wofford set up a buy as well. On June 26, they set up a buy for 9:00 a.m., but Marquez spent most of the day scurrying after Diaz. Shortly after noon, Marquez called Isabel from a pay phone near Diaz's garage:

Marquez: What, what did Angelo tell you?

Isabel: Oh, I'm going to call him now because I was calling this other one on the telephone.

Marquez: Uh ... uh ... did you call the beeper or what?

Isabel: On the beeper.

Marquez: Well, he's not at the shop. I'm here at the shop.

Isabel: Well, I called the beeper, and when I called it was busy.

Marquez: The guy is crazy, man. I don't know what we're going to do. And PeeWee [Agapito Sanchez, another Marquez drug supplier who was indicted as a member of the conspiracy] isn't in Chicago.

Isabel: God!

Marquez: Oh. Listen ... look ... uh ... it's 12:15 right? ... At 12:30 call this number—call Gordon (UI).... For him not to worry, not to worry. I talked to him already, you see.... Yeah. Tell Gordon that this is Mrs. Marquez, and for him not to worry. To wait for me there, that I'm just waiting for my friend to arrive before going over there.

Isabel: Okay.

Later in the afternoon, at *Isabel's direction,* Marquez went over to the Shamrock to appease Wofford personally.

In addition to her involvement in Marquez' transactions with Wofford, Isabel helped purchase marijuana that Marquez sold to Tony Miller. In discussing Miller's debt, Marquez repeatedly referred to his wife as his business partner. Marquez told Willie Lay, an associate of Miller:

I no want no fuck around, nothing (UI) me and my wife in the middle. You hear me now? ... *Know me, you know me and my wife put a lot of my money, he putting my wife's money down on the mother-fucking floor* ... for this kind of shit.... It's important for Tony to talk with me.... *Or my wife* because, the guy come. The guy talk to me, something wrong with me and my wife. *I tell him my wife, I get out of the way, me and my wife get out the way.*

To recover money from Miller, Marquez began to make threatening calls to Miller's girlfriend, Anita Blackburn. Although the calls by Marquez to Blackburn on April 8 and May 3, which are specifically cited by the government as evidence of this fact, contain at most, heavily veiled suggestions of threats, Marquez must have made some more pointed ones as well because Blackburn called Marquez' home on May 15 and told Isabel to tell Marquez to quit threatening her, that she had nothing to do with Miller's debt.

Isabel knew about other debts owed to Marquez as well. In a motel meeting room in January, 1987, Marquez told DEA Agent George Murray that his wife knew of a $2000 debt Murray owed them. Another Marquez associate, L.V. Johnson spoke to Isabel about a debt Marquez owed to him. While it is not clear whether this debt was related to a drug transaction, it does help to establish that Isabel knew about her husband's transactions in some detail.

Isabel also knew the risks her husband's activities entailed. During one conversation with another Marquez associate, Gustavo, she told him that Apolinar had been arrested the day before in Michigan City:

Gustavo: But why? Because of a license, drinking, or what?

Isabel: No, it wasn't for drinking.

Gustavo: Because of the other thing?

Isabel: No, not that either.... God forbid, my dear!

Even Isabel concedes that "the jury could have inferred that [drugs] was what their conversation referred to." Br. at 8.

Perhaps most damning is the conversation between Isabel and Marquez on April 21, 1987. Marquez called from a meeting he was having with Carlos Mejia to discuss some drug transactions:

Marquez: I'm here talking with Carlos.

Isabel: Oh, all right.

Marquez: I went over there.

Isabel: Oh, you did? And did you see the man?

Marquez: Yes, I saw him. He brought— he had it cut. He'll put it tomorrow.

Isabel: Oh!

Marquez: That other problem was (UI).

Isabel: Uh-hmm.

Marquez: To the person that had talked to him.

Isabel: Uh-huh.

Marquez: It was about a hit, right?

Isabel: Uh huh.

Marquez: Then ... the person said the car was too high ... the price.

Isabel: Oh.

Marquez: That's what I talked to Carlos about. He told me that—I—me too. I told him that I was—that I was in a hurry. That I needed that car to go fast.

Isabel: Uh-huh.

Marquez: Then he told me he could put it out fast, but that it had to be in parts—in small pieces.

Isabel: Uh-huh.

Marquez: Not like that—all at once. I told him, you know—I had told him.

Isabel: Uh hmm.

Marquez: To give me three or four days. (UI). He showed me two. You know what I mean?

Isabel: Uh-huh.

Marquez: So I talked to Carlos, I told him the same thing. I told him the problem was that the price for that car was too high.

Isabel: It's true.

Marquez: You know what I mean?

Isabel: Uh-huh.

Marquez: That person had to have 2 or 3 days in order to offer the car to people, know what I mean?

Isabel: Uh-huh.

. . . . .

Marquez: The bastard is a liar. He doesn't—I don't know, but the bastard doesn't deserve anything. And the guy (UI). I'm not going to help him anymore—in anything. And I want to talk—when I open the business and all that—but if he continues like this—this is a bitch. And listen to what I'm going to tell you—when I go (UI) because tomorrow I want to eliminate all that stuff out. When I finish with Carlos around ten or eleven. Okay?

Isabel: Uh-huh.

Marquez: So, separate everything because I want (UI) because Carlos is getting a lot of people from down there.

Isabel: Shhh! Shut your mouth! Too much blah, blah.

Marquez: I'm not talking to anyone—there's nobody around here.

Isabel: It doesn't matter, it doesn't matter, but you are talking on the phone.

Although Marquez did most of the talking, Isabel's few substantive responses were telling: she agreed that the price he was charging for drugs was too high; she acknowledged instructions to "separate everything" in preparation for the buyers Carlos Mejia was rounding up; and she warned Marquez not to talk so freely over the phone lest someone overhear them. This conversation not only attests to Isabel's prophetic powers; it also confirms the central role she played in Apolinar's affairs.

All of these facts distinguish Isabel from Debbie Williams, whose conspiracy conviction we reversed in *United States v. Williams*, 798 F.2d 1024, 1029 (7th Cir. 1986). Williams was married to another defendant who was heavily involved in a drug distribution conspiracy. We reversed her conviction because the government failed to prove that she had any "involvement in the conspiracy other than her presence on certain occasions while her husband engaged in drug transactions." *Id.* at 1029.

The government did not make the same mistake here. The recordings of phone calls in which Isabel participated reveal not only that Isabel knew about Apolinar's drug activities, but assisted him in the business. She knew the code. She knew the prices. She knew the players. She put up money. She helped track down suppliers. She appeased customers. She fretted when the deals didn't go down as planned. She worried about getting caught. These facts completely undermine Isabel's assertion that "the evidence against [her] was much less damning than that presented against Debbie Williams." More than any other defendant, Isabel knew of, and par-

ticipated in, the full gamut of her husband's activities.

## B. *Prejudice*

 Having concluded that the evidence was insufficient to establish that defendants Diaz, Nunez, Claudio, and Taylor agreed to join the single, ongoing conspiracy to distribute drugs charged in the indictment, we must determine whether the variance denied any of them a fair trial.[13] These defendants spend much of their brief arguing that they were prejudiced because the mass of evidence contributed to the finding of a single conspiracy, but that view frames the issue improperly. We have already determined that the single conspiracy finding was erroneous; the question before us now is whether it was prejudicial. We conclude that it was not.

Initially, the defendants maintain that they were prejudiced by the trial court's failure to give a multiple conspiracy instruction. We have said in the past that "[i]f the possibility of multiple conspiracies exists, the trial judge must so instruct the jury." *United States v. Kendall*, 665 F.2d 126, 136 (7th Cir.1981); *see also Varelli*, 407 F.2d at 746 (trial court "should" instruct the jury on multiple conspiracies when possibility of variance appears). The defendants maintain that the jury should have been told to acquit the defendants if it concluded that more than one conspiracy existed, suggesting the following instruction: [14]

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other, separate conspiracy.

This instruction is misleading because it incorrectly suggests that a multiple conspiracy variance is always fatal. As we pointed out in *United States v. Wozniak*, 781 F.2d 95, 97 (7th Cir.1985), "a jury may be told to convict a defendant who committed some variant of the events charged in the indictment, so long as the variant is also illegal." In *Wozniak* we rejected a proposed instruction that was substantively identical to the one offered by the defendants here. The appellants try to distinguish *Wozniak* on its facts, but its facts have nothing to do with the legal principle just quoted. If there was sufficient evidence to convict the defendants of conspiring to distribute illegal drugs, then their convictions were valid, notwithstanding that the indictment characterized as a single conspiracy what in fact were several. As we noted at the outset, a variance of this sort is only fatal if the defendants were prejudiced by the government's failure to prove a single conspiracy. *Supra* at 1389–1390. The failure to give a proposed multiple conspiracy instruction cannot, then, be error unless the defendants demonstrate that they have been prejudiced by the variance itself.

A number of factors bear upon the prejudice created by a variance between indictment and proof. As we explained in *United States v. Lindsey*, 602 F.2d 785, 787–88 (7th Cir.1979):

The Supreme Court has looked to the following factors to determine whether this type of variance is prejudicial: (1) surprise to the defendant resulting from

---

**13.** Although the evidence was sufficient to find that defendants Isabel Marquez and Mejia joined with Marquez in an ongoing distribution conspiracy, we must also consider whether they were prejudiced by the variance. Since Diaz, Claudio, Nunez, and Taylor did not join the *ongoing conspiracy, Mejia and Isabel could also* have been prejudiced by the erroneous finding that these defendants were their coconspirators.

In light of our finding that the evidence was insufficient to establish that defendant Townsend conspired with *any* of the defendants, there is no need to inquire further as to preju-

dice to him, and we reverse his conspiracy conviction.

**14.** The defendants did not object at trial to the failure to give a multiple conspiracy instruction or offer an alternative instruction at trial; thus we proceed under the "plain error" standard of review. "A plain error is one that is 'not only palpably wrong but also likely to cause the outcome of the trial to be mistaken.'" *United States v. Requarth*, 847 F.2d 1249, 1254 (7th Cir.1988) (quoting *United States v. Kehm*, 799 F.2d 354, 363 (7th Cir.1986)).

the variance, (2) possibility of subsequent prosecution for the same offense, (3) likelihood of jury confusion as measured by the number of conspirators charged and the number of separate conspiracies proven, and (4) likelihood of jury confusion in light of the instructions given the jury limiting or excluding the use of certain evidence not relating to the defendant.

The defendants do not argue surprise, and do not face the danger of subsequent prosecution, which is an argument to raise when the government has alleged multiple conspiracies where it should have charged one, as in *United States v. Powell*, 894 F.2d 895 (7th Cir.1990). Defendants therefore focus on the possibility of jury confusion, and so will we.

Defendants argue that the number of conspiracies that actually existed, the number of persons they involved, and the length of the trial, made it too difficult for the jury to assess their cases individually. There is, undoubtedly, a danger of "spillover" prejudice in a trial of the magnitude that these defendants faced. We find that danger to be minimal, however, when the government presents tape recordings of each and every defendant discussing the distribution of illegal drugs. As our review of the evidence makes clear, the evidence was more than sufficient to establish that each of these defendants conspired to distribute illegal drugs; the jury had no need to look beyond each defendant's own words in order to convict. Thus we fail to see how any of the defendants were prejudiced by the variance.

■ For the same reason, we do not think the defendants were prejudiced by application of the coconspirator exception to the hearsay rule. Unlike *Martinez de Ortiz, supra*, in this case it was error to have admitted the statements of all defendants for purposes of determining whether each was a member of a single conspiracy since we have concluded that, as a matter of law, they were not. But there was little need, if any, for the jurors to look to the words of others when each defendant supplied enough to ensure his own undoing.

*See Pallais, supra*, 921 F.2d at 688 (improper introduction of hearsay held harmless because defendant had himself made incriminating statements to the witness which were properly admitted as admissions).

Indeed, the coconspirator statements to which the defendants point claiming prejudice pale in significance to those made by the defendants themselves. We will cite just a few examples. Luis Diaz maintains that he was prejudiced by Marquez's statements to Agent Wofford that his supplier worked in an auto repair shop and was named Luis. Aside from the fact that Diaz clearly did conspire with Marquez, making Marquez's statements against him admissible under the coconspirator exception anyway, Diaz seems to ignore the fact that other evidence overwhelmingly established these facts, much of it derived from a tap on the phone at his garage. Similarly, defendant Claudio alleges that he was prejudiced when the prosecutor, in closing argument, highlighted a conversation between Diaz and Marquez in which Diaz told Marquez that he was working with "the guy from the insurance," a reference to Claudio. He clearly conspired with Diaz, however, so the prosecution was entitled to use this evidence against him.

Diaz also complains about the testimony of government witnesses and alleged coconspirators Marshall Sprawls and John Abadia relating to the use of code. This testimony was hardly critical to the government's case against Diaz, however, and did not consist of hearsay anyway. Defendant Nunez argues only that the evidence linking him to Marquez in a conspiracy was highly ambiguous, suggesting that the evidence of Marquez's other dealings, as well as those of the other defendants, tipped the scales against him. As we have noted, however, the evidence concerning Nunez's agreement to work with Marquez was not at all ambiguous, although whether he ever carried through with their agreements was. The former fact suffices to support Nunez's conspiracy conviction, and his own words established his willingness to work with Marquez.

We earlier acknowledged that defendants may be prejudiced by a multiple conspiracy variance if their sentences are increased on the basis of the drug-related activities of defendants with whom they did not conspire. *See supra* at 1388–1389. These concerns are not present in this case. Only defendant Taylor can potentially claim that she was exposed to greater punishment, since she was involved only with marijuana, but her two year sentence reflects her limited involvement, particularly when contrasted with the seven year sentences received by Diaz and Nunez, and the fifteen year sentences received by ·Mejia and Claudio. The Sentencing Guidelines were not applicable to this case, and a *Pinkerton* instruction was not given, so none of the defendants may claim that their sentences were increased on the basis of drug transactions that were not attributable to the limited conspiracies in which they participated. *Compare Glenn*, 828 F.2d at 860 (giving of *Pinkerton* instruction lead jury to convict one of the defendants for possessing over 1000 pounds of marijuana when evidence was insufficient to support her conviction for joining the marijuana objective of the conspiracy).

### II. Telephone Counts

In addition to conspiracy, each of the appellants was convicted of violating 21 U.S.C. § 843(b) by using a telephone to facilitate narcotics offenses. Defendants Townsend, Claudio, and Isabel Marquez contest the sufficiency of the evidence to sustain their convictions for these offenses.

### A. *Townsend and Claudio*

The judge instructed the jury that it could convict a defendant for telephone facilitation if, among other elements, the evidence proved beyond reasonable doubt that the defendant had committed any one of three offenses: (1) possession; (2) distribution; or (3) conspiracy to possess or distribute, controlled substances. Townsend and Claudio challenge their facilitation convictions on the ground that the convictions may have rested on invalid grounds since the government did not prove that they committed all three of these offenses. In *United States v. Berardi*, 675 F.2d 894 (7th Cir.1982), we held that, to sustain a conviction on a count charging multiple acts, it must be shown that "there is sufficient evidence to support the charge as to *each* of the acts alleged." *Id.* at 902. In *United States v. Beverly*, 913 F.2d 337 (7th Cir.1990), however, we upheld the conviction of a defendant charged in the same count with conspiring to impede investigations of the IRS and the DEA, citing "the general rule" that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Id.* at 357 (quoting *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970)); *accord United States v. Sababu*, 891 F.2d 1308, 1326 n. 6 (7th Cir.1989); *United States v. Bucey*, 876 F.2d 1297, 1312 (7th Cir.1989); *United States v. Soteras*, 770 F.2d 641, 646 (7th Cir.1985); *United States v. Mackey*, 571 F.2d 376, 387 (7th Cir.1978); *United States v. Reicin*, 497 F.2d 563, 568–70 (7th Cir.1974).

At first blush, these rules seem to conflict, with *Beverly* standing for the proposition that it doesn't matter whether the defendant could have been convicted of every ground alleged in the count, if she could have been convicted of one of them, and *Berardi* saying that if the defendant couldn't have been convicted of one of the grounds, the conviction must fall. *Berardi*, however, derives from the rule announced in *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), and reaffirmed by the Supreme Court in *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983), "that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *See also Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 ("where the verdict is supportable on one ground, but not on another, and it is impos-

sible to tell which ground the jury selected," the verdict must be set aside). The *Stromberg* rule applies if "the jury were instructed that their verdict might be given with respect to anyone of them, independently considered." 283 U.S. at 368, 51 S.Ct. at 535. (Our pattern conspiracy instruction contains a species of such a "one-is-enough" instruction; *see* 3 Federal Criminal Jury Instructions of the Seventh Circuit § 5.11 (1986)). It is only when the jury is instructed that its verdict may rest on any single ground alleged in a charge that, after a ground is invalidated, we cannot discern whether the verdict was based on an invalid ground. (The problem might also arise in a case in which the indictment count listed multiple grounds in the alternative rather than, as in this case, the conjunctive.) To reach a verdict in the absence of such a "one-is-enough" instruction, the jury would be obliged to find that the government proved each act or ground alleged beyond a reasonable doubt, and the subsequent elimination of one or more of the grounds would not create the risk that the verdict was based solely on the invalid ground.

In *Beverly* the jury was not given a "one-is-enough" instruction, *see* 913 F.2d at 348, and the *Stromberg* rule did not apply. The *Beverly* court may have misperceived the breadth of the rule, however, because its citations to it did not recognize the caveat that limits its application to cases where the jury receives such an instruction. *See* 913 F.2d at 362. That omission may have prompted the court's discussion of the distinction, apparently originated in a line of cases in the Ninth Circuit, and subsequently adopted in some of our own, between grounds invalidated for legal or constitutional deficiencies and those invalidated because there was insufficient evidence to support them. *See id.* at 362–65. Those cases suggest that the *Stromberg* rule does not trump the *Turner* rule when the reason one of the possible grounds for conviction is invalid is merely the lack of evidence supporting that ground.

The logic behind the distinction is open to question. On the one hand, as we noted in *Sababu*, 891 F.2d at 1325–26, special verdicts in the criminal law are disfavored. We generally do not demand that juries justify their verdicts. When we review a verdict on a challenge to the sufficiency of the evidence, we cite the evidence that was available to the jury in reaching its verdict, but we do not know whether, in fact, that evidence had anything at all to do with their verdict. Their verdict may have been based on evidence in the record, but it may well have been based on any number of considerations that, while we deem them improper, are generally beyond the pale of appellate review (we try, instead, to eliminate, or reduce, the impact of such considerations ahead of time). On the other hand, a ground supported by insufficient evidence *is* legally deficient. Indeed, it is probably more so than, for example, one that is deficient only because barred by the statute of limitations. *See, e.g., Yates.*

Perhaps because its rationale is debatable, our cases have not applied the distinction consistently. Even in *Beverly*, for example, we treated the claim of one defendant regarding the general verdict as a challenge to the sufficiency of the evidence supporting the challenged object of the conspiracy. We held *Yates* inapposite only because there was in that case sufficient evidence for the jury to convict the defendant under the challenged ground; "[a]s such, the general verdict was permissible." 913 F.2d at 358 n. 29. We also distinguished cases holding that insufficient evidence was enough to invalidate a general verdict on the basis that a "one-is-enough" instruction had been given. *See* 913 F.2d at 364 n. 39. Similarly, in *United States v. Holguin*, we held that when a "one is enough" instruction is given concerning facts charged in the conjunctive we must review "each of the allegations to see if there was sufficient evidence for each allegation." 868 F.2d 201, 203 n. 5 (7th Cir. 1989); *see also Berardi*, 675 F.2d at 902 ("*So instructed*, a general verdict of guilty on such a charge charging multiple acts may be upheld only if there is sufficient evidence to support the charge as to *each* of the acts alleged.") (emphasis supplied). *See also United States v. Anderson*, 809

F.2d 1281, 1284–85 (7th Cir.1985) (recognizing that giving of "one-is-enough" instruction is not error, but carries with it the consequence that "the court reviewing the conviction must determine whether there was sufficient evidence to support a finding as to each predicate act alleged.").

Reference to the Supreme Court's precedents is also unhelpful. None of the Court's cases discuss the relationship between these two rules. While the Court has never drawn the distinction explicitly, and the *Stromberg* rule is couched in broad language (general verdict must be set aside if it could have been based on an "insufficient ground," *Zant,* 462 U.S. at 881, 103 S.Ct. at 2744), the Court has not, to our knowledge, applied the rule to a case in which the reason the ground was invalidated was a lack of evidence.

We believe that the best course is to recognize the distinction between legal and factual sufficiency. It is consistent with our conception of the jury's role, and to reject it would force us, by dint of logic, at any rate, to consider radically revising that role. That is not, we believe, what the Supreme Court had in mind when it created the rule. It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.

Claudio's facilitation convictions may therefore stand because the evidence was sufficient to sustain his conspiracy conviction. It is immaterial whether the calls actually facilitated possession or distribution, the alternative grounds, because they did facilitate his conspiracy with Marquez. The evidence was not sufficient, however, to support Townsend's conspiracy conviction. The government was therefore obligated to present evidence that the June 11 phone call actually facilitated someone's possession with intent to distribute or dis-

tribution of the heroin. The government did not present any evidence that any deal resulted from the phone call, however, and Townsend's conviction on Count 74 must therefore be reversed. The government simply failed to prove that he facilitated anything.

### B. Isabel Marquez

 Isabel Marquez was convicted of facilitating a narcotics offense by means of her telephone conversation with her husband Apolinar during the evening of April 21, 1987. Much of that conversation has been quoted at pages 47–49 of this opinion. Isabel contends that the conversation "in no way facilitated the conspiracy," but her brief also admits that "[m]ost likely [Apolinar] was talking about drugs; possibly Mrs. Marquez knew that." Br. at 15. We think that is an accurate characterization, and one that suffices to sustain her conviction for facilitation. This conversation clearly furthered the conspiracy between Isabel and her husband. Apolinar was recounting his activities to her and directing her to "separate everything" before he returned in order to prepare for drug sales; she in turn warned him to use the code when talking on the phone in order to avoid detection. This is more than enough "facilitation" of the conspiracy to support the conviction.

### III. Buyer–Seller Instruction

 Dorothy Taylor asserts that the district court erroneously declined to give the jury an instruction concerning the status of a mere buyer-seller relationship on a defendant's membership in a conspiracy.[15] Her proposed instruction stated:

Mere proof of the existence of a buyer-seller relationship is not enough to convict one as a co-conspirator on drug conspiracy charges.

A defendant is only entitled to an instruction, however, when, *inter alia,* there is some basis in the evidence to support the defense theory underlying the instruction. *See United States v. Douglas,* 818 F.2d

---

**15.** Mason Townsend also requested a buyer-seller instruction. We do not include him in this discussion since we have decided to reverse his convictions on other grounds.

1317, 1321 (7th Cir.1987). Taylor maintains that there was no evidence to suggest that she was buying for other than personal consumption; she seems to forget that she told Marquez that she had "been selling weed for fifteen years"; she also told Marquez that she had managed to unload the "bunk weed" he had sold to her. These statements alone are enough to support the inference that she was buying from Marquez for resale to her own customers. And since, as we noted earlier, Marquez knew that she was buying for resale, the evidence was sufficient to establish a distribution conspiracy between them, even if not the one alleged in the indictment.

Taylor makes much of the fact that, during its deliberations, the jury sent several notes to the judge requesting further instruction on the status of a purchaser of drugs Its "revised question" asked:

> If an individual purchases a controlled substance for personal use does this transaction fall under the third proposition when determining a telephone count—namely does the term distribution refer to the defendant's *intent* or does the purchase itself constitute distribution for *any* party involved in the transaction no matter what the ultimate use by a particular party may *be*.
>
> When A sells to B does B have to distribute as well if B is being considered for a possible phone count under the 3rd proposition the government must prove for this charge.

Transcript at 3591. We held in *Douglas, supra,* that the fact that the jury requested additional instruction on the subject supported the conclusion that the defendant's proposed instruction should have been given. But in *Douglas* the defendant's theory had some support in the record; here it has none. Moreover, it is far from clear that the jury's request related to its evaluation of Taylor's case; it could have related to defendant Townsend's as well.

## IV. Other Crimes Evidence

█ The government presented evidence that Carlos Mejia sold an ounce of cocaine to an undercover government agent before the charged conspiracy began. Mejia objected to the introduction of this evidence, asserting that it was barred by Rule 404(b). The district court admitted the evidence with an instruction limiting the jury's consideration of the evidence to the issues of Mejia's identity, intent, and knowledge. We conclude that the district court properly admitted this evidence for the purpose of determining identity; we disagree, however, that this evidence could have been properly used to establish Mejia's intent to join the conspiracy or his knowledge of the conspiracy.

The government argued first that the evidence was probative of identity because it demonstrated that Mejia responded to beeper number 306–0845, a number Marquez paged during the course of the conspiracy. That information, we agree, was relevant, and was properly admitted. Mejia's counsel requested that the district judge limit the government's evidence to that point, but the district court allowed it to introduce the details of the drug sale. The judge could have limited the government's presentation in that manner, and we might have done so ourselves, but we do not think the judge erred by refusing to do so. Segregating this information from the context of a prior drug sale would have significantly diminished its force, which would then have rested solely on the credibility of the government witness testifying that Mejia had, on a past occasion, responded to that beeper number. The details of the transaction enabled the jury to evaluate this kernel of information in context. We do not require the government to present its evidence in a vacuum; it was entitled to explain the context to the jury.

█ The judge also permitted the jury to consider this evidence to establish "intent" and "knowledge." The court was not explicit, however, about what intent or knowledge the evidence was admissible to prove. At trial, the government said only that the evidence showed Mejia's "knowledge and intent with respect to drug deliveries and his intention to deliver drugs." Undoubtedly the evidence established these things with respect to the sale to the government agent, but we cannot agree

that they established Mejia's knowledge and intent with respect to the conspiracy without indulging the inference forbidden by rule 404(a), namely that Mejia knew about and intended to further the later conspiracy to distribute drugs simply because he had a propensity for dealing drugs. The district court erred, therefore, in instructing the jury that it could consider the evidence of the cocaine sale for the additional purposes of establishing Mejia's knowledge of, and intent to join, the conspiracy.

Nevertheless, we find the admission of this evidence, in light of the overwhelming evidence linking him to the conspiracy—mostly in the form of Mejia's own words—to be harmless. Obviously, this evidence was prejudicial, and certainly had the potential to make up for a weak government case, but the government's case against Mejia was anything but weak. As we noted earlier, the evidence established that Mejia was a close partner of Marquez, familiar with many, if not all, of his activities. We are therefore convinced that, absent the overly broad limiting instruction, the jury would have reached the same result.

### V. Conclusion

Learned Hand described the conspiracy charge as the "darling of the modern prosecutor's nursery." *Harrison v. United States,* 7 F.2d 259, 263 (2d Cir.1925). Its attraction has not diminished with the passage of years; nor, consequently, has the need for courts to harken back to the basic principles underlying conspiracy liability when reviewing closely the evidence supporting such charges. Our review in this case convinces us that the evidence was insufficient to prove that defendants Diaz, Claudio, Nunez, Taylor, and Townsend joined the conspiracy charged in count 1 of the indictment. Nevertheless, their own conversations with Marquez clearly established that Diaz, Claudio, Nunez, and Taylor did conspire to violate § 841(a) with Marquez, so they suffered no prejudice from the variance. The convictions of all defendants but Mason Townsend on count 1 are therefore AFFIRMED; Townsend's conviction on count 1 is REVERSED. Because

his conspiracy conviction cannot stand, and the government failed to prove that Townsend ever received any drugs as the result of the June 11 phone call, Townsend's conviction on count 74 for violating § 841(b) is also REVERSED; the convictions of defendant Claudio on counts 83, 86, and 89, and of defendant Isabel Marquez on count 46 are AFFIRMED.