47 F.3d 1170
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tony CARR and Adrian Rodgers, Defendants-Appellants.
 Nos. 94-5242, 94-5244.
 United States Court of Appeals, Sixth Circuit.
 Jan. 12, 1995.
 
 Before: JONES, NORRIS and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendants-appellants, Tony Carr and Adrian Rodgers, challenge their convictions for conspiracy to possess and distribute crack cocaine and for aiding and abetting in the possession with intent to distribute crack cocaine. They received concurrent sentences of 188 months, to be followed by five years supervised release. On appeal, Carr claims that the government violated the Supreme Court's rule, set out in Batson v. Kentucky, 476 U.S. 79 (1986), that the government may not select or reject jurors on the basis of race. Rodgers challenges the admission of a prior consistent statement by a co-conspirator and government witness, Keenon Richmond. Both defendants claim that, as a matter of law, a single sale is insufficient to form the basis for a conspiracy conviction. In addition, Carr argues that, even assuming that a single sale may support a conspiracy conviction, there was insufficient evidence to link him to any conspiracy. We find no reversible error in connection with the errors assigned on appeal and affirm.
 
 
 2
 The record indicates that this case began when a paid informant, "David", contacted Shelby County Deputy Sheriff Frank Joyner and indicated that he knew a person who would sell him five ounces of cocaine for $4,800.00. This person was later identified as Keenon Richmond. A transaction was arranged for October 7, 1992. That morning, Richmond and David met at an Exxon station in Memphis. Detective Cecil Booker accompanied David, posing as David's cousin. Booker offered to show Richmond the money at that time, but Richmond declined. Richmond told David that he had thus far been unsuccessful in his attempts to obtain the cocaine.
 
 
 3
 Richmond left the meeting and went to another area, where he met with Adrian Rodgers. Richmond asked Rodgers if he knew where to get the amount of drugs in question. Rodgers told Richmond that he did not have that amount, and the two went to a pay phone and made several unsuccessful calls in an attempt to locate the proper amount. Eventually, Rodgers got in touch with Tony Carr, who indicated that he would be able to supply the requisite amount.
 
 
 4
 After discussing several possible locations, Richmond, Rogers, Carr, and David agreed to meet at the Metro Market at noon. Richmond left to go to his grandmother's house. A half an hour later, he picked up Rodgers and went to another house, which Richmond testified was that of defendant Carr. The three went to Carr's car, where Carr showed Richmond the cocaine and gave it to Rodgers. The three then left for the Metro Market, Richmond driving himself and Rodgers riding with Carr in Carr's Pontiac.
 
 
 5
 Joyner, David, and numerous other officers also went to the Metro Market, where they set up surveillance. Detective Booker, still posing as David's cousin, waited in the car while David entered the market. After Richmond, Rodgers, and Carr arrived, Rodgers also went into the market, then came out and went back to the Pontiac. In a few moments, Rodgers got out of the Pontiac and went over to David's car, where he put the cocaine on the passenger seat. When David indicated to Booker that the drug transaction had occurred, Booker got out and opened the trunk of the car, ostensibly to get the purchase money. This action signalled the other officers that transfer of the cocaine had occurred and that it was time to move in. Officer Joyner arrested Rodgers, who was standing next to the Pontiac. Keenon Richmond fled on foot but was chased down and apprehended. One officer testified that she had seen Carr at the scene and that, when the police moved in, he got out of the Pontiac on the driver's side, ran around the rear of the car, dropped something, and fled. At that spot was found a matchbox containing 3.97 grams of crack. A plastic bag containing 88.36 grams (which is actually approximately four ounces -- Richmond was going to "short" David) of crack was found in Richmond's car.
 
 
 6
 Jointly indicted with Carr and Rodgers, Richmond ultimately agreed to testify against his co-defendants as part of a plea agreement with the government. This agreement was brought out during his testimony at trial.
 
 I.
 
 7
 With regard to the Batson question raised by defendant Carr, the record is not completely clear. Although counsel now agree that several black jurors were seated in this case, it appears that the government used four of its peremptory challenges to strike African-Americans from the jury. When counsel for defendant Carr objected to these strikes, the government offered what it considered a racially neutral reason in each of the four cases. Two of these strikes are challenged on appeal.
 
 
 8
 One was exercised to strike an African-American man, Leroy Flynn, who was a father of one adult child and had not been recently employed. The government cited his lack of employment as the reason for rejecting Mr. Flynn as a juror, and the district judge accepted unemployment as a racially neutral reason for exercising a peremptory challenge. However, the defense characterizes this reason as pretextual, given the fact that the government had earlier failed to strike a Caucasian woman, Fannie Freeman, who was also the unemployed parent of an adult child.
 
 
 9
 The other peremptory challenge was exercised to strike an African-American woman, Latonya Frazier. The government's stated basis for challenging Ms. Frazier was that she appeared offended by the comment of another juror during voir dire, then nodded vigorously in agreement with the court's admonition following the comment. The comment, made by a prospective juror named James Farrell, was in response to the court's question concerning personal and familial experiences as victims of crime:
 
 
 10
 The Court: Anybody else? Yes, sir?
 
 
 11
 Farrell: My son's window was broken into and the window busted out.
 
 
 12
 The Court: Would that influence your judgment?
 
 
 13
 Farrell: It was a young black man that --
 
 
 14
 The district judge immediately interrupted Farrell and addressed the entire jury panel:
 
 
 15
 The Court: We do not need to know if anybody has any feeling of racial bias or prejudice that would interfere with your ability to sit fairly and impartially as members of this jury, and I certainly need your honest answer on this, but I would also certainly hope that one doesn't think that because a young man might have been the one who broke in to your son's car that you can't give these two young black men a fair and impartial trial on these charges. So I mean if anybody honestly feels that way, I certainly need to know about it, but on the other hand, sometimes on a jury one person says something and it kind of gets catching. I don't want anybody to feel -- I need to know if it is a real concern, but on the other hand, I hope that if you think about it, I hope we don't have people jumping to make that generalization.
 
 
 16
 The district judge excused Mr. Farrell for cause and later noted that despite the court's admonition to the jury, Ms. Frazier appeared to her to be "very offended" by this incident. The judge accepted as a racially neutral reason the prosecutor's statement of "concern" about seating Ms. Frazier, given a display of hostility which the prosecutor feared "might interfere with her judgment as a juror."
 
 
 17
 It is difficult to predicate a reversal on the basis of the government's rejection of Mr. Flynn, in light of the fact that the apparently disparate treatment of Ms. Freeman was not brought to the district judge's attention at the time the strike was challenged, and there was thus no opportunity to test the prosecutor's stated reason to determine if it was, indeed, pretextual. As to Ms. Frazier, it appears that the question of race was only tangentially involved in the incident that gave rise to the prosecutor's concern. As the district judge noted in ruling on the strike of Ms. Frazier:
 
 
 18
 [In exercising a peremptory challenge, the prosecutor] doesn't have to establish cause. A Batson challenge doesn't permit the Court to say that was a good reason or that was a bad reason. All the Court is concerned with is whether there is a reason that is related to race. ... If [the prosecutor] challenges someone [peremptorily], the Court doesn't test the sufficiency, because it's not required that the reason be sufficient. All that's required is that ... the challenge not be based on race.
 
 
 19
 We are satisfied that the district court's failure to find a Batson violation was not error in this case.
 
 II.
 
 20
 Defendant Rodgers insists that the district court erred in permitting the government to offer a statement that Keenon Richmond made to police at the time of his arrest. It was ruled admissible under Rule 801(d)(1)(B) of the Federal Rules of Evidence, as a prior consistent statement offered to rebut a charge of improper motivation.
 
 
 21
 During direct examination by the prosecution, Richmond had described his plea-bargain agreement with the government under USSG Sec.5K1 by saying that the "primary requirement" under the Sec.5K1 agreement was "to tell the truth." On cross-examination, Rodgers's attorney attempted to impeach Richmond's testimony by introducing a statement that he made to the grand jury, as follows: "If I testified against Adrian Rodgers or Tony Carr, that the government may be able to step in and allow -- leave it up to the judge how much time I should get, and that was the main thing."
 
 
 22
 To rebut the implication that Richmond was motivated to lie about Carr's and Rodger's participation in the offense to get a reduction in his own sentence, the government sought to prove that the substance of his testimony implicating the defendants was consistent with Richmond's initial statement to police about their involvement in the conspiracy leading up to the Metro Market transaction. We conclude that the district court did not err in ruling the statement to be admissible.
 
 III.
 
 23
 Both defendants attack the legal sufficiency of the evidence, claiming that proof of a single buyer-seller transaction, without more, is insufficient to prove the existence of a conspiracy, and citing United States v. Townsend, 924 F.2d 1385 (7th Cir. 1991). As an abstract proposition of law, this assertion appears to be correct. In Townsend, for example, the Seventh Circuit noted that "[a] sale, by definition, involves two parties; their combination for that limited purpose does not increase the likelihood that the sale will take place, so conspiracy liability would be inappropriate." 924 F.2d at 1394 (citing United States v. Manzella, 791 F.2d 1263, 1265 (7th Cir. 1986)). But the Townsend court went on to add: "By contrast, when an agreement requires something more than the simple exchange of drugs for money, such as obtaining drugs for distribution -- see, e.g., Manzella -- adding liability to that carried by the substantive offense [by charging a conspiracy] may be appropriate." Id. (emphasis in original). We find, in this case, that something more than a "simple exchange of drugs for money" occurred.
 
 
 24
 Indeed, we conclude here, as we did in United States v. Barrett, 933 F.2d 355, 358 (6th Cir. 1991), under very similar circumstances, that the evidence summarized above established more than a mere buyer-seller relationship. The proof in this case reflected generally a conspiracy to supply cocaine and showed specifically that Richmond, Rodgers, and Carr acted in concert to obtain the contraband in question. The proof further showed that they were all present, by careful prearrangement, at the site where the sale was supposed to take place. Given the degree of concert and the active participation of all three men, we are satisfied that the evidence was legally sufficient to support the existence of a conspiracy in this case.
 
 IV.
 
 25
 Moreover, we reject Carr's separate claim that the evidence was insufficient to tie him to the conspiracy. Richmond's testimony identifies Carr as the ultimate source of the cocaine in question and places him at the Metro Market at the time the police moved in to make the arrests. One of the arresting officers saw Carr there just before Carr fled, leaving his car behind. The fact that he was not arrested at the scene is irrelevant to a determination of his guilt.
 
 
 26
 For the foregoing reasons, we AFFIRM the district court's judgment.